**Fannie ISRAEL and Mortimer H. Israel,
Plaintiffs-Appellees,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**No. 212, Docket 24241.**

United States Court of Appeals
Second Circuit.

Argued March 7, 1957.

Decided July 16, 1957.

Barry, Treanor, Shandell & Brophy, New York City (Joseph J. Brophy, New York City, of counsel), for plaintiffs-appellees.

George Cochran Doub, Asst. Atty. Gen., Paul W. Williams, U. S. Atty., New York City, Amos J. Peaslee, Jr., Asst. U. S. Atty., New York City, Paul A. Sweeney and Lester S. Jayson, Attys., Dept. of Justice, Washington, D. C., for defendant-appellant.

Before MEDINA and WATERMAN, Circuit Judges, and GALSTON, District Judge.

WATERMAN, Circuit Judge.

The defendant, the United States, appeals from a judgment below entered in favor of the plaintiffs, Fannie and Mortimer Israel, in this action brought under the Federal Tort Claims Act, 28 U.S.C. A. §§ 1346(b), 2674. Mrs. Israel sued to recover damages for personal injuries, and Mr. Israel to recover for medical expenses and loss of services. Judgment in the amount of $3,000 was awarded for the former and $2,000 for the latter, after a trial before the court without a jury.

The evidence adduced below tended to establish the following facts: On September 7, 1950, I. William Smollins enplaned from the Mahopac Airport, Putnam County, New York, in a light two-seater airplane owned by a corporation of which he was the sole stockholder. With him as a guest passenger was his mother-in-law, Mrs. Israel. Their ultimate destination was Chicago. While flying over western Pennsylvania, Smollins feared a shortage of fuel and decided to make an emergency landing at the Brookville Airport in Brookville, Pennsylvania, rather than continue on to Youngstown, Ohio, which he claimed at trial was his next intended stop. The Brookville Airport was owned by the United States Government and operated under the aegis of the Civil Aeronautics Administration as an "intermediate" or emergency airfield. Its two runways were grass surfaced and adapted for the use of light planes.

Smollins landed without mishap on the east-west runway, and purchased ten gallons of gasoline from Raymond Hartley, a Government employee in charge of the field. The gasoline was sold through a private concession, and the defendant did not receive any part of the proceeds. Smollins then started to take off from east to west on the east-west runway, which was 2,200 feet long—ample distance for a plane such as his to become airborne. During the first few hundred feet of the attempted takeoff, Smollins, apparently unintentionally partially applied the brakes, which were controlled by the same foot pedal as the rudder. As a result the plane did not attain sufficient speed to become safely airborne at the proper place on the runway. Realizing this danger, Smollins applied the brakes as hard as possible, but was unable to bring the plane to a stop until it had gone over an embankment a few yards past the end of the runway. In the ensuing crash Mrs. Israel was seriously injured.

The trial court pointed out that Smollins was negligent in his handling of the plane, but that his negligence could not be imputed to Mrs. Israel, who was a gratuitous passenger. The court also found that the runway was "unusually rough" and therefore "hazardous," and that the defendant was negligent in failing to maintain and operate this airfield in a safe condition. According to

the trial court, this "roughness" was a contributing cause of the accident and hence a basis for the plaintiffs' recovery.

On appeal, the defendant has devoted most of its argument and brief to distinguishing the cases relied upon by the trial court, Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, affirmed sub nom. United States v. Union Trust Co., 1955, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 835, and to arguing that the plaintiffs were only gratuitous licensees who are not entitled to any recovery because they failed to show that the defendant had knowledge of the hazardous condition, if any, of Brookville Airport.

 We do not find it necessary to discuss these contentions, however, because we are setting aside the judgment below on another ground. A close reading of the record in this case convinces us that there was no credible evidence to support the conclusion of the trial court that Brookville Airport was "unusually rough" and therefore "hazardous." To the contrary, all the authoritative testimony, including that of the witness primarily relied upon by the trial judge, was to the effect that the surface of this airfield was comparable to that of many other civilian turf airfields in the same general area. And, regardless of the legal status of the plaintiffs, the defendant's duty to the plaintiffs, if any, in the language of the trial court, was only "to maintain the surface of this airfield on a par with airfields *of this type.*" (Emphasis added.) We believe that the defendant performed this duty.

The uncontradicted testimony of several Government witnesses, including Harry Fried, the Chief of Structures and Ground Section of Facilities Maintenance of the CAA, and Private Mato, a Pennsylvania State Trooper whose sole duty for three years prior to this accident was to investigate aircraft violations and accidents in northwestern Pennsylvania, produced the following data about the character and topography of the east-west runway: The Brookville Airport had formerly been the site of a one-mile oval race track. From the east end of the east-west runway moving west—the course of the attempted takeoff—the runway sloped gently upward at approximately a two-degree gradient for 1,200 feet. The remaining 1,000 feet gradually declined at approximately ¾ of one degree. The highest point on the field was about twenty-five feet above the lowest point, but there were no sharp inclines. The surface of the field was grass, although there were some bare spots on the runways. At the time of this accident the grass on the east-west runway was between four and six inches in height. Private Mato was permitted to testify without objection that, although grass of an average height of eight inches was considered a hazard under Pennsylvania state regulations, grass of a height of four to six inches would be "all right."

The pilot, Smollins, testified that as he attempted to take off, the left wheel of his plane seemed to hit a deep depression, which slowed the plane and jarred it from its course. He further testified that on his return to the field on the day after the accident, he found a three-foot-square hole, eighteen inches deep, about 800 feet from the west end of the east-west runway. Mr. Israel, who had accompanied Smollins to the field for this inspection, and who is a lawyer, testified that Smollins mentioned the hole, but that he, Israel, did not go out to see it. Three Government witnesses—Hartley, the superintendent of the field, Clarence Wilson, the CAA safety investigator, and Private Mato—testified that they investigated the entire field closely after the accident, particularly the area surrounding the wheel tracks of Smollins' plane, and that they found no such hole or depression. Wilson also testified that he had seen no bumps on the airfield over one-half inch high.

Smollins, in his testimony, at trial, described the airfield as being "rough" and "fairly rough". in general, and "very

rough" at the particular point where he attempted to take off. He did not, however, draw any comparison between the surface of this field and that of other small grass-surfaced airfields. Perhaps significantly, on the day of the accident he did not comment to Hartley upon the condition of the east-west runway when he purchased gasoline from the latter, although he had landed on that runway a moment earlier.[1]

 The trial judge concluded that the Brookville field was "unusually rough," and in support of his conclusion appears to have relied exclusively on the accident reports made out by Private Mato and Clarence Wilson, the CAA Safety Agent, shortly after the accident. The trial court made no reference to Smollins' testimony. In his police report Mato described the Brookville field as "rather rough." In that portion of the official CAB Accident Report which is designated "Investigator's Statements," the following comment was made by Wilson: "* * * the field is also rough and would tend to cause an aircraft to bounce on the take-off run and lose lift."[2] After citing these two reports, with particular emphasis on that

1. It seems apparent that the trial court gave little weight to Smollins' testimony. Thus, although Smollins testified that he had not applied his brakes before reaching the final 600 to 800 feet of the runway, the court found that he had. While Smollins claimed at the trial that he had had 100 hours' flying time in this particular plane, the Government introduced a signed statement made shortly after the accident wherein the pilot said to Private Mato, "I have about 25 hours in this airplane. I'll be truthful with you, the accident may not have happened if I had had more time in it." The trial court specifically found that Smollins "had only about twenty-five hours flying time in this particular type of plane and was not over-familiar with its controls."

In addition, no witness except Smollins found a large hole in the east-west runway, despite careful searches by several of those witnesses, and the trial judge did not mention any such hole in his findings.

2. It would seem that those statements of the investigator (Wilson) in the CAB accident report that contained references to probable causes of the accident were inadmissible as evidence in this litigation under 49 U.S.C.A. § 581, which, insofar as here relevant, provides that "no part of any report or reports of * * * the Civil Aeronautics Board relating to any accident, or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports." That statutory provision "was designed to guard against the introduction of C. A. B. reports expressing agency views about matters which are within the functions of courts and juries to decide." Lobel v. American Airlines,

Inc., 2 Cir., 1951, 192 F.2d 217, 220; see also Universal Airline v. Eastern Air Lines, Inc., 1951, 88 U.S.App.D.C. 219, 188 F.2d 993, 1000. This provision has been construed rather narrowly, however. See, e. g., Universal Airline v. Eastern Air Lines, Inc., supra (testimony of CAB investigator admissible); Lobel v. American Airlines, Inc., supra (CAB accident report admissible since report "consisted wholly of the investigator's personal observations about the condition of the plane after the accident," and did not contain "opinions or conclusions about possible causes of the accident or defendant's negligence"); Ritts v. American Overseas Airlines, Inc., D.C.S.D.N.Y. 1947, 97 F.Supp. 457 (testimony of a witness examined by the CAB in the course of an accident investigation held admissible); Tansey v. Transcontinental & Western Air, Inc., D.D.C.1949, 97 F.Supp. 458 (reports made by employees of defendant airline pursuant to CAB investigation of an accident held admissible). Nevertheless, it would seem to us that the evaluating remarks contained in Wilson's statement, and relied upon by the trial court, are exactly the type of data that was intended by Congress to be inadmissible in private litigation under the provisions of 49 U.S.C. § 581. Here, however, counsel for the defendant said at the trial that the CAB report was competent, he did not object to its introduction by the plaintiff, and, in fact, he later introduced certain critical portions of Wilson's statement relating to probable causes, which had been deleted from the plaintiffs' exhibit. Thus the defendant is without standing on appeal to claim error in the admission of this evidence, which the trial court could properly accord its natural probative value. Fed.Rules Civ.Proc. rule 46, 28 U.S.C.A. Cf. Olsen v. Realty Hotel

of Wilson, the trial court announced that "It is our opinion, based on the conclusion of defendant's own expert, that this airfield was hazardous and that defendant maintained and operated it in that condition."

Having examined the reports of Mato and Wilson in their entirety, together with the testimony of these two witnesses given in explanation of these reports, we conclude that the trial judge did not evaluate the language used therein in relation to the standards applicable normally to fields of this type, and that his reliance on the contents of the reports was therefore misplaced. We do not think that the reports provide support for his conclusion that the Brookville runways were "unusually rough," i.e., they were not "on a par with airfields of this type."

Mato, in explanation of his earlier written statement that the field was "rather rough," testified that the east-west runway "wasn't smooth like * * * a billiard table," and that occasionally "a stone under the surface of the ground would cause * * * a little bump." This witness said that "as compared to * * * a concrete highway or concrete runway, it would be considered on the rough side," but that the Brookville field was "not hazardous." And Mato, as well as Wilson, found no hole or indentation in the runways deeper than one half inch.

Wilson, who had landed at Brookville several times in light planes and who also had flown the same type of airplane as that involved in this crash, although not so enplaning from Brookville, testified that the field was not smooth "in comparison to a hard surface runway," but that it was "comparable to other sod, turf fields, the same type of field, same

general condition." He also said that it was "bumpy, *but not in excess*" (emphasis added), and that it was an "average field" of its type. Wilson had previously testified that he was familiar with about 100 civilian turf airfields in western Pennsylvania and part of West Virginia.[3]

Nor does the testimony of those most familiar with the Brookville field support the opinion below. Hartley, the field superintendent, testified that he examined the field twice a week, often by driving over the entire field in an automobile at fifty to fifty-five miles per hour—the take-off speed of Smollins' plane. He said that the "east-west runway was in good condition." He also had enplaned from the field many times without difficulty or mishap. In addition, Hartley testified that Smollins did not mention any hole to him on the day after the accident, although Hartley spoke to the pilot at that time.

The deposition of William Parr, the field caretaker, was also introduced. The deponent testified that he had examined the field the day before the accident occurred, and had found it in "good condition."

After our examination of the record, we can only conclude that the trial court, in adjudging this field "hazardous," must have either misconstrued the testimony of the defendant's experts or evaluated the condition of the field by an erroneous yardstick. It was undisputed that the Brookville Airport was designed only to provide an emergency haven for small aircraft. It was not a commercial airport, and no charge was exacted for its use. It was operated by the Federal Government, as a public service to the flying public, and it annually averaged slightly less than one emergency land-

Corp., 2 Cir., 1954, 210 F.2d 785, 787; Smails v. O'Malley, 8 Cir., 1942, 127 F. 2d 410, 415; In re Gentile, D.C.Ky.1952, 107 F.Supp. 476, 478; Stafford v. Roadway Transit Co., D.C.W.D.Pa.1947, 73 F. Supp. 458, 463.

3. Although the trial judge would not permit Wilson to answer a question by the Government counsel as to whether Brookville was "a safe field to take off from," declaring that this was a question to be resolved by the court alone, the court, in its opinion below, asserted that its conclusion of "hazardous" conditions was "based on the conclusion of defendant's own expert."

ing per day.[4] From all the credible evidence adduced below, it appears that this field was comparable, in respect to safety, to scores of civilian grass-surfaced airports in the surrounding area. Hence we hold that the Government cannot be found negligent, on the basis of this record, in the maintenance and operation of this airfield at the time of the event in suit.

Judgment reversed.

**LICHTER FOUNDATION, Inc.,**
Appellant,

v.

**Russell A. WELCH, Appellee.**

**SOUTHERN FIREPROOFING COMPANY, Inc., Appellant,**

v.

**UNITED STATES of America,**
Appellee.

**Jacob LICHTER and Jennie L. Lichter,**
Appellants,

v.

**UNITED STATES of America,**
Appellee.

**Nos. 13000–13002.**

United States Court of Appeals
Sixth Circuit.

Aug. 30, 1957.

Paul W. Steer, Cincinnati, Ohio, Charles H. Tobias, Jr. and Steer, Strauss & Adair, Cincinnati, Ohio, on brief, for appellants.

Marvin W. Weinstein, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attorneys, Washington, D. C., Hugh K. Martin, U. S. Atty., Cincinnati, Ohio, on brief, for appellees.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

---

4. Although the testimony was unclear, it seems that only two minor accidents had occurred at the Brookville Airport prior to the one here in issue. However, no evidence was introduced as to the cause of those accidents, or as to the length of time during which the field had been in operation at the time of the accident here.