Kalodner, Circuit Judge, dissented from denial of petition for rehearing.

Marion J. BERGUIDO, Individually et al.,

v.

EASTERN AIR LINES, INCORPO- RATED, Appellant.

No. 14060.

United States Court of Appeals Third Circuit.

Argued Nov. 23, 1962.

Decided March 25, 1963.

Rehearing Denied May 28, 1963.

Frederick B. Lacey, Shanley & Fisher, Newark, N. J. (Rawle & Henderson, Michael van Beuren, Philadelphia, Pa., Daniel L. Stonebridge, New York City, Robert E. Jones, J. Welles Henderson, Jr., Philadelphia, Pa., on the brief), for appellant.

B. Nathaniel Richter, Philadelphia, Pa. (Frank F. Truscott, Truscott, Kline, O'Neill & Howson, Charles A. Lord, Seymour I. Toll, Arthur G. Raynes, Richter, Levy, Lord, Toll & Cavanaugh, Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and McLAUGHLIN, Circuit Judge, and SHERIDAN, District Judge.

McLAUGHLIN, Circuit Judge.

This is a wrongful death action brought, individually and as executors of the estate of the deceased, Carlos Berguido, Jr., against Eastern Air Lines. Decedent was a passenger for hire on an Eastern Constellation that crashed near Imeson Airport, Jacksonville, Florida in the early morning hours of December 21, 1955.

In giving the case to the jury, the trial court ruled that the rights of the parties were governed by the treaty known as the "Warsaw Convention", 49 Stat. 3000 (1929), which applies to flights in "international transportation."[1] The Warsaw Convention provides, inter alia, that the carrier is absolutely liable for all injuries where the accident causing the damage so sustained takes place on board the aircraft. Article 17. In such circumstances the liability of the carrier for each passenger is limited to 125,000 francs (approximately $8,300). Article 22(1). In order to escape that liability, the carrier has the burden of proving that it has taken all necessary measures to avoid the damage or that it was impossible for it to take them. Article 20 (1). On the other hand, if the plaintiff sustains his burden of proving that the damage is caused by the "wilful misconduct" of the carrier, "[t]he carrier shall not be entitled to avail himself of the provisions of this convention which exclude [Art. 20(1)] or limit [22(1)] his liability." Article 25(1). It is within the framework of that latter portion of the treaty that the problems before us arise.

---

1. The cause, as submitted, was also restricted to the right of decedent's widow to claim recovery under the Florida Wrongful Death Act. Fla.Stat.Ann. §§ 768.01, 768.02 (1958 Supp.). And see Citrola v. Eastern Air Lines, Inc., 264 F. 2d 815 (2 Cir., 1959).

The jury found that the crash was the result of one or more acts of wilful misconduct on the part of defendant and entered a verdict for plaintiff in excess of the Convention limitation. Defendant's appropriate post-trial motions were denied and appeal followed.

This was a thoroughly and exhaustively prepared case, made all the more difficult by the fact that there were no survivors to the crash and the damage to the plane was severe. Simply stated, plaintiff's theory was that, due to the steadily increasing weather deterioration in the airport vicinity, the crew of Eastern's flight came in at an excessive rate of speed, attempting to land before the airport closed down. In so doing, the pilot also executed a "sneak-in" pattern by which he deliberately flew below his glide slope and authorized minimum [2] and ducked under the overcast in order to "take a look". This alleged deliberate behavior was claimed to have been the cause of the aircraft's crash into the wooded area about three fourths of a mile from the end of the runway with its tragic consequences.

The key to plaintiff's theory lay in the testimony of her two expert witnesses, Glickstein and Cann. They were permitted to testify, over objection, to the significance of certain facts which were propounded to them in a hypothetical question, and from which they tendered conclusions and opinions as to behavioral character of the flight's pilot.[3] The crucial assumed facts in these hypotheticals were that (1) the speed of the plane at the time of impact was 140 knots per hour; (2) during the last 200 feet of the flight path its angle of descent was 2½ degrees at a rate of 10 feet per second; (3) just prior to impact the attitude [4] of the aircraft was 11½ degrees right bank and (4) the plane was in a 4¾ degree nose-up position. These figures were the foundation upon which plaintiff's expert witnesses constructed their opinions as to whether or not the pilot intentionally flew below the glide slope and the authorized minimum. For example, Glickstein testified that the assumed fact that the plane was proceeding inbound from the outer marker at an angle of descent of 2½ degrees at 10 feet per second "leads me to the inescapable conclusion that the aircraft was under the absolute control of the crew * * ". The figures of 11½ degrees right bank and 4¾ nose-up angle "were very significant" in indicating that "after the pilot

2. The evidence indicates that the pilot was making an Instrument Landing System (ILS) Approach to the runway. A component of this system is the glide slope, which is, essentially, a radio beam that gives slope control—elevation control—at a pre-set angle of approach to the end of the runway and indicates to the pilot whether or not he is at the correct elevation as he comes in for his approach. At the time of the accident, the angle of approach on this specific approach was 2½ degrees.

"Minimums" refer to the weather minimums—required ceiling and visibility—prescribed by the then Civil Aeronautics Administration. The minimums for an aircraft of this type on an ILS approach were 200 foot ceiling and ½ mile visibility. If the pilot has reached the 200 foot level and does not have visual reference to the ground he must execute a missed approach. When the approach is visual the ceiling is 400 feet and visibility ¾ of a mile. It is undisputed that the plane was below both the 200 foot mini-

mum (assuming an instrument approach) and 400 foot visual minimum (assuming a visual approach). Thus, the crux of the case is how and/or why the aircraft got below both the glide slope and the legal minimum.

3. In particular, they testified to the effect that "the pilot took a calculated risk and deliberately flew the aircraft below the glide slope during his ILS approach," App. for Defendant, p. 289a, and he also "did intentionally fly * * * below his legal minimums", App. for Defendant, p. 349a. See also pp. 290a and 347a.

4. "Attitude" refers to "whether the plane was in a dive or climb, banking, or turning to the right or left, or climbing or banking and diving or banking." App. for Defendant, p. 238a. The assumed attitude of 11½ degrees right bank and 4¾ degrees nose-up refers to the fact that the plane, just prior to impact, was in a slight turn to the right and banked 11½ degrees with the nose-up 4¾ degrees from the plane's line of motion.

had gotten himself into the position where it was too late, he was now desperately trying to get back on his localizer indicator." [5]

It is readily apparent that the admission of the above data was extremely prejudicial to the defense. Defendant contends that it is just as apparent that these figures were inadmissible.

They were put into evidence by the testimony of Van Epps and Searle, the chairmen, respectively, of the Operations and Structures Committees of the Civil Aeronautics Board (CAB) team that investigated the crash. Following the policy suggested in Universal Airline v. Eastern Airlines, 88 U.S.App.D.C. 219, 188 F.2d 993 (D.C.Cir.1951) and encouraged by the CAB the depositions of the two men were taken, with all objections, except as to form, being reserved until the trial. At the trial portions of Van Epps' deposition were read, in which he gave all of the above figures but those concerning the angle and rate of descent. The record indicates that in stating the figures Van Epps was reading from the summary report submitted by Searle (as head of the Structures Committee), thus "refreshing his recollection" and then testifying as to what the figures were. However, the record is also clear that evidentially Van Epps was only refreshing his recollection as to the things he personally observed at the scene of the crash—the propeller slash marks through the trees, and impact marks on the turf and trees. In the sense of recalling what he had previously read from Searle's report he also refreshed his recollection as to the figures in that report. He, himself, had made none of the computations: they were the direct responsibility of Searle, as chairman of the Structures Committee, and were determined by a man working under Searle.

The reading of Searle's deposition at the trial again introduced these computations, including those relating to the angle and rate of descent. However, on cross-examination defendant brought out that the calculations had been done by one Schmidt, a Lockheed aeronautical engineer working under Searle's supervision. It is this fact which brings into focus the basic area of conflict between the parties.

Defendant urges that this testimony is barred by the prohibition of Section 1441(e) of the Civil Aeronautics Act, 49 U.S.C. §§ 1301–1542 (Supp.1962), which provides, in pertinent part, that "no part of any report or reports of the Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports." The judicial interpretation of this section has not been too extensive or precise.[6] Defendant places primary reliance on Lobel v. American Airlines, 192 F.2d 217 (2 Cir., 1951). It argues that Lobel establishes the rule that Section 1441(e) prohibits a CAB investigator, such as Searle, from testifying to anything except his personal observations about the scene of the crash and the condition of the plane after the accident. Thus, since Searle had no first hand knowledge of the above facts to which he testified the section bars the use of such testimony at trial.

This argument blurs the essential policy and reason behind the section with other policies affecting the admissibility of evidence. The fundamental policy underlying 1441(e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank disclosure as to the probable cause and thus help prevent future accidents and the countervailing policy of making available all accident information to litigants in

---

5. App. for Defendant, pp. 309a, 310a. See also pp. 349–52.

6. For a summary of the cases construing this provision see Israel v. United States, 247 F.2d 426, 429 fn. 2 (2 Cir., 1957).

a civil suit.[7] Accordingly, the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident. Of necessity, the opinion testimony of the CAB's investigators would also come within this rule.[8] However, the testimony of Searle as to the calculations made by Schmidt certainly does not come within the ambit of the privilege. His was not evaluation or opinion testimony, for it reflects in no way the CAB's findings as to the probable cause of the crash.

■ The fact that this evidence is not barred by Section 1441(e) is not conclusive of the question, however, for it does not consider whether the testimony might otherwise be inadmissible under the rules of evidence. Defendant would have it that Searle's testimony based upon Schmidt's findings is hearsay and inadmissible. On the other hand, plaintiff argues with great vigor that "Schmidt's only function was to provide the mathematics" and "the simple operation of mathematics as performed by Schmidt clearly does not make this testimony either hearsay or opinion" as defendant would contend. A careful reading of Searle's deposition convinces us that the work done by Schmidt was much more than a mere "simple operation of mathematics." Although the actual mathematical calculations might, in themselves, have been "simple", the cross-examination of Searle and the later testimony of defendant's expert witness, La Vake, make it plain that Schmidt had to make certain assumptions and choices relative to the physical facts found at the crash scene before he could reach the final computation stage. Furthermore, the testimony of Searle indicates that he had no knowledge of how Schmidt arrived at his final figures and what assumptions were made in the process. The inherent

vice of all hearsay evidence so becomes apparent, for, at the very least, defendant had no opportunity to cross-examine Schmidt and ascertain from him the basis of his computations; to test the validity of said basis, including whatever assumptions he made, if any, and what he did regarding the information available to him; to ascertain his method of computation and to test its validity, etc. For this reason we hold that it was prejudicial error to admit the evidence at the trial.

■ Plaintiff urges that even though we might find such testimony of Searle to be hearsay it is still admissible, for Searle's committee report, which contains the same information, is acceptable under the Federal Business Records Act, 28 U.S.C. § 1732 (Supp.1962), as part of a routine business record. Initially, we note that the report itself was not in evidence nor was it suggested as a reason for the admission of the evidence.[9] More fundamentally, this is not the same situation as that presented to us in Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3 Cir., 1950), the decision upon which plaintiff relies. In Moran we were not faced with a statutory provision that revealed a congressional policy to bar the use in litigation of the accident reports of the Bureau of Mines. That is the fact here, however, with respect to the reports of the CAB and to admit these reports for the reason plaintiff names would be to ignore explicit congressional policy,[10] which we decline to do. In passing, it might be noted that the particular holding in Moran would seem to be of doubtful value on the precise issue with which we are concerned in light of our later ruling in Gordon v. Robinson, supra, note 9.

We have carefully studied the other points advanced on behalf of the defend-

---

7. See Simpson, Use of Aircraft Accident Investigation Information in Actions for Damages, 17 J.Air L.&Com. 283 (1950).

8. The CAB has so interpreted Section 1441 (e). See, Introductory Statement of counsel for the CAB, Van Epps deposi-

tion, p. 3. And see Israel v. United States, supra.

9. Cf. Gordon v. Robinson, 210 F.2d 192, 196 (3 Cir., 1954).

10. Cf. Palmer v. Hoffman, 318 U.S. 109, 115, 63 S.Ct. 477, 87 L.Ed. 645 (1942).

ant. We do not consider that any of them involves reversible error. In view of our above dispositive holding there is no need of examining those points in detail.

The judgment of the district court will be reversed and the case remanded for a new trial.

BIGGS, Chief Judge (concurring).

I concur in the result reached by the majority opinion and in large part with the views expressed in it. I am convinced, however, that not only was that portion of Searle's testimony which was based in substantial part on Schmidt's computations inadmissible as hearsay, but also an important part of Van Epps' testimony, that portion based on Searle's report filed with the CAB, was inadmissible as hearsay too. The admission of the evidence referred to was substantially prejudicial.

## ON PETITION FOR REHEARING

Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE and SMITH, Circuit Judges.

PER CURIAM.

In our original opinion in this case we reversed the judgment of the district court and remanded the case for a new trial for the reason that prejudicial hearsay testimony was erroneously admitted into evidence at the trial. Upon careful reconsideration of the record and the petition for rehearing we adhere to our original view.

The initial points raised by the dissent to this petition are a repetition of plaintiff's position before us on the original appeal, are based on a restrictive reading of the record and are fully covered in the court opinion. Similarly, reliance on our recent opinion in Roberts v. United States (Union Carbide Corp.), 316 F.2d 489 (1963) is clearly misplaced, for (1) that case is distinguishable on both its facts and decisional basis and (2) defendant's repeated objections throughout the course of the trial and in its post-trial motions to the admission of this evidence form no basis for a ra-

tionale that it "acquiesced" in the erroneous admission.

Petitioner's request for a partial new trial limited to the liability issue is properly denied. See Romer v. Baldwin, 317 F.2d 919 (3 Cir. 1963); Thompson v. Camp, 167 F.2d 733, 734 (6 Cir.), cert. denied 335 U.S. 824, 69 S.Ct. 48, 93 L.Ed. 378 (1948).

The petition for rehearing will be denied.

KALODNER, Circuit Judge (dissenting).

I would grant the petition for rehearing for these reasons:

First: The court en banc should consider and decide the primary critical issue of first impression at the appellate level whether testimony of a chairman of a Civil Aeronautics Board (CAB) investigating team based on his official report to the CAB of an airplane accident investigation is inadmissible as "hearsay" to the extent that it embraces factual data and mathematical calculations premised thereon, assembled by him or under his direct supervision by a team member, which he has "checked" and found "to be true". I hold to the view that such evidence is not "hearsay".

Second: The record does not sustain this Court's factual determination that "Schmidt [a member of the CAB team] had to make certain *assumptions* and choices relative to the physical facts found at the crash scene before he could reach the final computation stage", and that "Furthermore, the testimony of Searle [chairman of the CAB team] indicates that he had no knowledge of how Schmidt arrived at his final figures and what *assumptions* were made in the process." The trial record affirmatively establishes that Searle testified in his deposition that he had supplied to Schmidt the factual physical data which formed the premise of Schmidt's mathematical calculations; thereafter, he "checked" the contents of his summary report which included the physical data and calculations and found them "to be true"; all the facts stated in his report were

based solely on the evidence assembled in the accident investigation by him or members of his team under his direct supervision; and, *that as far as he knew Schmidt had not made any "assumptions"* in making his calculations. With reference to the foregoing it appears that our determination that Schmidt had made "assumptions" rested on the opinion expressed by LaVake, defendant's expert, that he must have done so. On this score, it must be noted that the trial judge had specifically—and correctly so —instructed the jury that it was its duty "to determine" whether the hypothetical questions put to all the experts "have any assumptions that were not established by the evidence." The jury's verdict in favor of the plaintiff establishes that the evidence was not based on "assumptions" and in making a contrary determination we usurped the jury's function of choosing between Searle's testimony that no assumptions had been made and LaVake's *estimate* to the contrary. In doing so we disregarded the Seventh Amendment of the Constitution.

Third: Assuming arguendo that the data based on Schmidt's calculations was inadmissible as "hearsay" and was thus erroneously permitted by the trial court to be used as the premise of a hypothetical question put to plaintiff's experts designed to elicit their opinions as to whether the plane crash was due to wilful misconduct on the part of its pilot, the defendant "cannot now be heard to complain" since it "acquiesced" in the erroneous admission when it put virtually the identical hypothetical question to its own experts. We have just so held in Roberts v. United States et al., and Union Carbide Corporation, et al., 316 F.2d 489, (1963), citing Spears v. Atchison, Topeka & Santa Fe Ry. Co., 255 F.2d 780, 784 (7 Cir. 1958).

Finally, I would limit a new trial to the issue of liability in view of the court's expressed views with respect to the points raised on the appeal by the defendant on the issue of damages.

The issues of liability and damages had been submitted to the jury in the instant case in separate interrogatories with the approval of the parties, and the jury had been fully instructed by the trial judge that the issues of liability and damages were independent of one another. This Court has in the past limited the trial of issues upon remand under the authority of 28 U.S.C.A. § 2106. Rosa v. City of Chester, Pa., 278 F.2d 876 (3 Cir. 1960); United States v. Calvey, 110 F.2d 327 (3 Cir. 1940). To the same effect see Calaf v. Fernandez, 239 F. 795 (1 Cir. 1917) and Judge Hastie's excellent discussion in the recent case of Romer et al. v. Baldwin, et al., 317 F.2d 919 (1963).

Judge HASTIE, while not joining in this opinion, would also grant the petition for rehearing.