**In re AIR CRASH AT CHARLOTTE, NORTH CAROLINA ON JULY 2, 1994.**

**No. MDL 1041.**

United States District Court, D. South Carolina, Columbia Division.

Dec. 27, 1996.

---

James Wilton Orr, Bowers, Orr & Dougall, Columbia, SC, Lawrence Edward Richter, Jr., The Richter Firm, P.A., Mt. Pleasant, SC, William Parham Simpson, Haynsworth, Marion, McKay & Guerard, Columbia, SC, Michael L. Baum, Kananack, Murgatroyd, Baum & Hedlund, Los Angeles, CA, Frank H. Granito, Speiser, Krause, Madole & Nolan, New York City, Marc Moller, Lori B. Lasson, Kreindler & Kreindler, New York City, David E. Rapoport, Rapoport & Kupets Law Offices, Rosemont, IL, for Plaintiff's Steering Committee.

Mark A. Dombroff, Tom Almy, Dombroff and Gilmore, Washington, DC, Edward Wade Mullins, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Richard B. Watson, Nelson, Mullins, Riley & Scarborough, Charleston, NC, for USAir.

Patrick E. Bradley, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Raymond E. Clark, Asst. U.S. Attorney, Columbia, SC, for U.S.

## PRETRIAL ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

These cases came before the court for a final pretrial conference on December 16, 1996. During the conference, the court discussed with counsel several trial-related issues and heard oral argument on motions *in limine* that had been filed. This order shall serve to memorialize the agreements that were reached at the pretrial conference and to announce the court's decision on the disputed motions.[1]

### Consolidation

All of these cases arise out of the crash of USAir Flight # 1016 on July 2, 1994. They were transferred to this district pursuant to 28 U.S.C. § 1407 for resolution of all pretrial matters. Thereafter, defendants moved to transfer all of these cases to this district for trial on all issues pursuant to 28 U.S.C. § 1404(a). Plaintiffs in all but two of the cases consented to such a procedure and these cases were transferred here for trial on all issues.[2] The court entered an order over the objection of the plaintiffs in the remaining two cases, transferring the cases to this district for determination of liability and entitlement to punitive damages and, potentially, for a determination of the amount of the punitive damages award.[3]

Presently, there are twenty-eight cases pending on this court's docket to be tried against USAir. Nineteen cases involve wrongful death claims and nine cases involve survival actions.

The court will consolidate all of these cases for trial before a single jury. The jury will be selected on Thursday, January 9, 1997, and the trial will commence on Tuesday, January 21, 1997. Phase I of the trial will put to the jury the question of whether USAir is liable for actual damages and whether USAir is liable for punitive damages. All parties, except for the plaintiffs in *Doucette* (C/A No.: 3:96–1119–17) have agreed on the record that the substantive law in North Carolina should apply to these two issues.[4]

After verdicts are received in Phase I, the court will make a determination as to how

---

1. A separate order is being entered addressing those motions related to admission into evidence of the settlement agreement and the government's admission of liability.

2. A case transferred to this district recently, *White v. USAir*, C/A No.: 3:96–3377–17, was not included in the earlier consent transfer order. In a conference call conducted on December 16, 1996, Ronald Thompson, counsel for the plaintiff in that case, consented to transferring the case here pursuant to § 1404(a). He also agreed that the substantive law of North Carolina should apply to liability issues. Accordingly, the case is transferred to this district pursuant to § 1404(a) and North Carolina law shall apply to the liability issues.

3. The two cases that did not consent to a transfer were *Doucette v. USAir*, C/A No.: 3:96–1119–17 and *Young v. USAir*, C/A No.: 3:95–4081–17. Plaintiff in *Young* did agree to a partial transfer to determine liability only.

4. Plaintiffs in *Doucette* have suggested to the court that Texas choice of law rules would preclude application of North Carolina law to the liability issues. The court has invited the parties to brief this issue and will make a determination as to the applicable law in the *Doucette* case after reviewing these briefs.

the remainder of the trial should be conducted. Of course, if USAir is exonerated by the jury, there will be no need for further proceedings. If USAir is found liable for actual damages, but not punitive damages, the court has the option of allowing the jury that heard Phase I of the trial hear damages testimony on three or four "exemplar" cases and returning a verdict for actual damages in those cases. Hopefully, the verdicts thus obtained might serve as a catalyst for settlement for the remaining cases. If the remaining cases do not settle, the court will dismiss the jury and empanel subsequent juries to try actual damages only.

If the Phase I jury determines that USAir is liable for both actual and punitive damages, the court will make every effort to submit the actual and punitive damages question to that same jury. If the number of cases remaining for trial is small enough (that is to say, if a sufficient number of settlements are obtained prior to the verdict), it may be possible to allow the Phase I jury to hear and determine all actual damage awards and one punitive award. If, on the other hand, the number of cases going to trial is so large that it would be impractical to expect the Phase I jury to hear full testimony on actual damages as well as punitive damages, the court reserves the right to put the punitive damages question, but not the actual damages question, to the Phase I jury.[5] This could conceivably be done by allowing each of the plaintiffs an opportunity to present abbreviated testimony to the jury regarding the harm they sustained. The jury would also be exposed to other evidence relating to punitive damage issues such as the net worth of the defendant. The jury would then be allowed to return one punitive damage award and would indicate to the court, by way of a special interrogatory, how the award should be divided among the plaintiffs. After returning its punitive award, if any, the Phase I jury would be dismissed and subsequent juries would be empaneled to

hear full evidence on actual damages and make appropriate awards. The alternatives discussed in this order are the various possibilities the court has available to it once the Phase I verdicts are rendered. As can be seen, the proper course of action will depend upon a number of factors, not the least of which is the verdicts rendered in Phase I and the number of cases remaining for trial when the consolidated trial begins. The court will make a determination as to how the damages phase of the trial will be conducted as soon as possible when the relevant information is obtained. All that can be determined at this time is that there will be a consolidated Phase I trial and it will deal with liability for actual damages and liability for punitive damages only, and that the substantive law of North Carolina will apply to the Phase I trial, except, possibly, as to the *Doucette* plaintiffs.

### Presence of Counsel At Trial

The court has appointed a plaintiffs' steering committee ("PSC"), which presently consists of six attorneys, all well versed in aviation litigation, to manage these cases and to conduct discovery on behalf of all of the plaintiffs. These attorneys have taken the lead in conducting discovery as to liability issues and presenting pretrial motions. It is anticipated that the members of the plaintiffs' steering committee will all be actively involved in the trial of this case, with three of them taking primary responsibility for in-court presentation. The court does not, however, wish to discourage attendance or participation by any of the attorneys of record for the various plaintiffs. The court will leave it to the various plaintiffs' attorneys in these cases to determine whether to attend the trial and the degree to which they should participate.

That being said, it must be remembered that the verdicts rendered in this consolidated trial will be binding on all plaintiffs, and

---

**5.** The reason for attempting to allow the Phase I jury to determine the amount of the punitive award is the fact that the Phase I jury would have already heard all of the evidence relating to the conduct of the defendant, which is one factor the jury must consider in fashioning a punitive award. If subsequent juries were asked to set

the amount of the punitive award, those juries would necessarily have to hear the liability testimony all over again. If the Phase I jury does not find that plaintiffs are entitled to a punitive award, there would be little, if any, duplication of effort, because subsequent juries would need to hear only testimony regarding actual damages.

for this reason, it is imperative that all counsel of record for the various plaintiffs be in attendance for the trial or obtain the written consent of their clients to be absent. A consent form appropriate for this purpose is attached to this order.

**Each plaintiff's attorney of record must be present for the trial or provide the court with a duly executed consent form by January 13, 1997.**

### Miscellaneous Trial Issues

It is the court's intention to empanel sixteen or more jurors to begin the trial of this case in order to have an ample number of jurors in the event drop-outs occur.

By agreement of counsel, each side shall provide forty-eight hours notice of the witnesses to be called in the case. That is to say, at the close of business on any given trial date, counsel shall provide to their opponents a list of all witnesses to be called the next two days, including impeachment witnesses.

By agreement of counsel, the court will provide notebooks and writing materials for each juror.

Counsel have indicated that they wish to prepare exhibit notebooks for the jury containing certain selected exhibits. That is to say, the notebooks would not contain all of the exhibits introduced by either party, but would contain key exhibits that might be referred to frequently during the testimony and the closing arguments. The court has no objection to this procedure but requests that the attorneys coordinate in advance so that there will be no misunderstanding about what is to go into the notebooks and how they are to be disseminated to the jury. It is requested that counsel provide three additional notebooks (one for the court and one for each of its law clerks) in addition to one for each of the jurors. Exhibits shall not be placed before the jurors through these notebooks until they are entered into evidence and adequately addressed by testimony.

### Motions *In Limine*

During the pretrial conference, the court heard oral argument on numerous motions *in limine.* The decisions announced in this order are tentative decisions. The court re-serves the right to reverse itself if, after viewing all the evidence, and considering the motion in the context of the evidence produced, the court becomes convinced that its initial ruling was in error.

### 1. USAir's Motion to Exclude Evidence of Prior Unrelated Accidents

For the reasons announced at the conclusion of the argument on December 16, 1996, the court will grant USAir's motion and exclude all direct reference to the fact that USAir Flight # 121 crashed in Philadelphia in 1976 and USAir Flight # 183 crashed in Detroit in 1984. Plaintiffs will, however, be allowed to refer generically to these crashes, as well as to crashes by other airlines, insofar as these prior crashes might be relevant on the issue of Microburst Windshear Probability Guidelines. These earlier crashes—whether of USAir or other airlines—should be referred to by date and location, but the identity of the airline involved shall not be disclosed to the jury. Additionally, the court will give a cautionary instruction explaining to the jury that they are not being told about the identity of the airlines involved in those crashes because it is not relevant and that they should not speculate about the identity of the airlines involved in those crashes.

### 2. USAir's Motion to Exclude Ground Radar Scan Evidence

For the reasons stated in open court on December 16, 1996, the court will, at this time, deny USAir's motion to bar testimony as to the readings of the WSR–88D ground radar data. The court will, however, ensure that the jury is not misled to believe that this radar reading was available to the pilots at or before the time of the crash. That is to say, the WSR–88D may be used by the plaintiffs to inform the jury of weather conditions prevailing at the time of the crash, but plaintiffs may not imply or suggest to the jury that the USAir pilots had this information available to them prior to or during the crash.

To the extent the WSR–88D radar data was used in plaintiffs' proposed airborne radar simulation, the question of whether, and to what extent, this radar data may be used

must await a hearing under the provisions of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Such a hearing cannot be conducted until the court has heard all of the necessary foundation testimony.

### 3. PSC's Motion To Admit the Factual NTSB Report, The NTSB Chairmen's Reports and The Corresponding Exhibits

■. By motion filed April 4, 1996, plaintiff moved *in limine* for a ruling that various portions of the National Transportation Safety Board ("NTSB") report relating to the Flight 1016 crash be admitted into evidence. The court heard argument on this motion in April and took the matter under advisement. Thereafter, the parties submitted additional briefs and plaintiffs pared down their requests so as to seek permission to introduce a total of nine NTSB Group Chairmen's Factual Reports. In response to the reduced request, USAir has agreed that five of the nine chairman reports may be admitted. For this reason, only four documents remain at issue: (1) the Survival Factors Group Factual Report (Exhibit 6–A); (2) the Structures Group Chairmen's Factual Report (Exhibit 7–A); (3) the Summary of Switch Positions (Appendix A to Exhibit 9–A); and (4) the Digital Flight Data Recorder Group Chairmen's Factual Report (Exhibit 10–A). On December 16, 1996 the court again heard extensive argument relating to these four documents and took the matter under advisement. For the reasons which follow, the court will grant the motion, with the understanding that the defendants will be afforded the opportunity to point out any particular parts of these reports that might contain opinions or conclusions which should be redacted.

Immediately after the crash of Flight # 1016, the NTSB, pursuant to its statutory mission, began an investigation into the circumstances that led to the accident. The investigation involved numerous individuals from USAir, McDonnell Douglas (the manufacturer of the DC–9 aircraft), the NTSB, and other United States agencies.

These individuals were organized into a total of fourteen groups, each group led by an NTSB employee and devoted to a particular aspect of the investigation, such as air traffic control, meteorological issues, flight data recorder, etc. Each of the groups collected data relating to its primary focus, conducting interviews, examining aircraft parts, conducting various tests and experiments, and engaging in related investigative techniques. The information obtained by the various groups was placed into written form and gathered into a multi–volume collection known as the Group Chairmen's Factual Reports. Additionally, the NTSB itself issues its own accident report containing the board's determination, including the probable cause of an accident, issued either as a narrative report or in a computer format.

As indicated previously, plaintiffs do not seek to introduce the NTSB report itself. Rather, they seek to introduce nine Group Chairmen Factual Reports, of which four are disputed by USAir.

49 U.S.C. § 1154(b) [6] provides, in pertinent part that:

> No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report.

Since 1951, Circuit Courts have routinely admitted the factual portions of investigative reports generated after an airline disaster. In *Lobel v. American Airlines, Inc.*, 192 F.2d 217 (2d Cir.1951), *cert. denied*, 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952), the Second Circuit approved the District Court's admission into evidence of a Civil Aeronautics Board (CAB) report offered by the plaintiff. The defendant had urged the Second Circuit to hold that admission of the report was error, relying upon the terms of 49 U.S.C. § 581—which was virtually identical to the present rule found at 49 U.S.C.App. § 1441(e) (presently codified as 49 U.S.C.A. § 1154(b)).[7] Rejecting the defendant's argu-

---

6. Originally codified as 49 App.U.S.C. § 1441(e) with minor changes in wording.

7. The Rule was enacted as § 701(e) of the Civil Aeronautics Act. Amendments to its wording

ment, the Court of Appeals held that the report was admissible because it did not contain conclusions on the cause of the accident or defendant's negligence. *See also* 23 Charles A. Wright & Kenneth W. Graham, *Federal Practice & Procedure* § 5437 at 895 n. 34 (stating that *Lobel* "view[s] the statute as designed to exclude influential expert opinions on the ultimate issue").

Several Courts of Appeals and District Courts have followed the rationale of *Lobel.* In *Berguido v. Eastern Air Lines, Inc.,* 317 F.2d 628 (3d Cir.), *cert. denied,* 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963), the Third Circuit affirmed the admission of deposition testimony of CAB investigators who, in part, relied upon the factual reports of other investigators, and explained the effect of Section 1441(e) as follows:

> the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident.... However, the testimony of [one investigator] as to the calculations made by [another government investigator] certainly does not come within the ambit of the privilege. His was not evaluation or opinion testimony, for it reflects in no way the CAB's findings as to the probable cause of the crash.

317 F.2d at 632. *See also Krause v. Chartier,* 406 F.2d 898, 902 (1st Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969) (citing *Berguido* and suggesting that it too believed Section 1441(e) only precluded "opinion evidence" from use at trials).

In *Ritts v. American Overseas Airlines, Inc.,* 97 F.Supp. 457 (S.D.N.Y.1947), the district court pointed to what it considered the central concern of Section 581: the use of Board "findings and conclusions" in civil litigation. *See also Tansey v. Transcontinental & Western Air, Inc.,* 97 F.Supp. 458, 461 (D.D.C.1949).

Similarly, *Fidelity and Casualty Co. of New York v. Frank,* 214 F.Supp. 803 (D.Conn.1963), followed the pattern of excluding only those portions of NTSB reports which make probable cause conclusions:

> While the courts avoid a construction of § 1441(e) which would deprive private litigants of the only source of proof usually available in cases of this kind, *Lobel v. American Airlines,* ..., they must apply the statute in their discretion to prevent the use in evidence of those portions of investigative group or subcommittee reports which, as a practical matter, would, in effect, tell the trier how the case should be decided....

214 F.Supp. at 805.

While in a later opinion, the same court held that "evaluation, opinion and conclusion evidence" would be inadmissible, that decision clearly maintained the admissibility of factual information from NTSB reports. *Fidelity and Casualty Co. v. Frank,* 227 F.Supp. 948, 949 (D.Conn.1964). Even so, it was subsequently criticized as too narrow. *See American Airlines, Inc. v. United States,* 418 F.2d 180 (5th Cir.1969).

More recently, in *Texasgulf, Inc. v. Colt Electronics Co., Inc.,* 615 F.Supp. 648 (S.D.N.Y.1984), the court concluded that "the NTSB factual findings are admissible in evidence, but its conclusions, and findings indicating its conclusions, are not." *Id.* at 651 (citing *Lobel,* 192 F.2d at 220).

Soon after *Berguido,* the Court in *Wenninger v. United States,* 234 F.Supp. 499 (D.De.1964), *aff'd.,* 352 F.2d 523 (3d Cir. 1965), held: "[t]o the extent that a report embodies facts assembled in connection with an investigation, and does not reflect the CAB's findings as to the probable cause of a crash, the statute does not exclude a report." *Id.* at 519.

In *American Airlines, Inc. v. United States, supra,* 418 F.2d 180, the defendant airline also relied upon Section 1441(e) in arguing for exclusion of an entire NTSB report, but the court found its argument "thoroughly at variance with the prevailing interpretation of the statute." *Id.* at 196. The court found no error in the district court's admission into evidence of portions of the NTSB report. *See also Curry v. Chevron, USA,* 779 F.2d 272, 274 (5th Cir.1985) (noting the "judicial gloss on § [1441(e) ] ...

were made to reflect the change in name of the

investigatory agency—now called the NTSB.

allowing factual portions of the report to be admitted"); *Moorhead v. Mitsubishi Aircraft Int'l, Inc.,* 639 F.Supp. 385, 393 n. 4 (E.D.Tex.1986), *aff'd. in part, rev'd. in part on other grounds,* 828 F.2d 278 (5th Cir.1987) (stating that "[f]actual portions of the NTSB report are admissible").

*American Airlines* also followed the holding in *Berguido* and held that "qualified testimony going beyond merely personal observations is admissible provided such testimony does not presume to be official agency opinion." 418 F.2d at 196. Rejecting the test proffered in *Fidelity and Casualty Co. of New York v. Frank,* the *American Airlines* court held "it would be better to exclude opinion testimony only when it embraces the probable cause of the accident or the negligence of the defendant." *Id.* The same reasoning applies to those opinions which relate to the facts and which are found in the NTSB reports.

In *Kline v. Martin,* 345 F.Supp. 31 (E.D.Va.1972), the court adopted the reasoning of the Fifth Circuit in *American Airlines* and ordered NTSB investigators to answer questions about the opinions they had developed in the course of an investigation, as long as the opinions did not relate to the probable cause of the accident. *Id.* at 32.

In *Mullan v. Quickie Aircraft Corp.,* the Tenth Circuit followed its earlier decision, *Keen v. Detroit Diesel Allison,* 569 F.2d 547 (10th Cir.1978), and again approved and followed decisions which "construed section 1441(e) to exclude only the parts of NTSB reports which contain agency conclusions on the probable cause of accidents." 797 F.2d 845, 848 (10th Cir.1986).

The district court in *Complaint of Armatur, S.A.,* 710 F.Supp. 390 (D.P.R.1988), stated that the "general rule is that the factual findings of ... NTSB reports are admissible if based on trustworthy sources, while evaluative conclusions are not admissible." *Id.* at 402.

*Seymour v. United States,* 15 Avi. Cas. 17, 141 (W.D. Texas 1978), suggested that since the NTSB factual reports were prepared by the defendant's own employees in that case, it was especially appropriate to allow that material into evidence. The same rationale applies here at least to some portions of the reports.

Numerous state courts have also held that the factual portions of NTSB reports are admissible under Section 1441(e). *E.g., Bolick v. Sunbird Airlines, Inc.,* 96 N.C.App. 443, 386 S.E.2d 76, 77 (N.C.App.1989), *aff'd.,* 327 N.C. 464, 396 S.E.2d 323 (1990); *Kastner v. Beech Aircraft Corp.,* 650 S.W.2d 312, 318 (Mo.App.1983); *Murphy v. Colorado Aviation, Inc.,* 41 Colo.App. 237, 588 P.2d 877 (1978); *Todd v. Weikle,* 36 Md.App. 663, 376 A.2d 104, 111 (1977).

Significantly, in recodifying §§ 1441(e) and 1903(c) at § 1154(b), Congress used the identical language of the previous statutes presumably knowing that that language had been long construed to permit the admissibility of the factual portions of Group Chairmen's Factual Reports.

The court is aware that some courts have taken contrary views. *See, e.g., In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 780 F.Supp. 1207 (N.D.Ill.1991). *Sioux City* is, however, in a distinct minority. After carefully reviewing the applicable authorities, this court is led to adopt the majority view.

It bears mention that the Fourth Circuit Court of Appeals has never directly addressed this issue. In *Travelers Ins. Co. v. Riggs,* 671 F.2d 810 (4th Cir.1982), the district court admitted the factual portions of the NTSB report but refused to admit its conclusions. On appeal, plaintiff contended that the court erred in not admitting the conclusory portion of the NTSB report. The Fourth Circuit noted that it "need not examine whether the district court correctly interpreted Section 1441(e) as allowing factual portions of NTSB reports to be admitted, because neither side disputes this here." *Id.* at 816. The court went on to say that "at the least" Section 1441(e) forbids the use of conclusory sections of NTSB reports. The court thus affirmed this evidentiary ruling of the district judge. Thus, while *Travelers* provides no real guidance to this court, it does, at least, demonstrate that the lawyers involved in that case conceded that the factual parts of the NTSB report should be admit-

ted, and the Fourth Circuit Court of Appeals did not, *sua sponte,* determine this to be plain error.

Having determined that Section 1441(e) offers no impediment to the four disputed reports at issue here, the court will afford USAir one final opportunity to identify any parts of the four disputed documents that contain opinions or conclusions that should be redacted if the documents themselves are introduced. If USAir wishes to avail itself of this opportunity, it should, on or before January 13, 1997, furnish copies of these documents to the court with the portions USAir believes constitute opinions or conclusions highlighted. Counsel for plaintiffs should be served with identically highlighted documents. Any challenges to USAir's indication of opinion segments should be submitted to the court by January 17, 1997. Upon receiving this submission, if any, the court will determine whether it is necessary to redact any portions of the four reports challenged by USAir.

### 4. USAir's Motion to Exclude Interview Notes of Weather Group Member Christopher Head

██ Christopher Head was a junior first officer with USAir and a member of the Airline Pilots Association ("ALPA"). He was assigned to the National Transportation Safety Board (NTSB) Meteorological Group as the ALPA representative. The NTSB meteorological group was assigned a task of conducting an investigation and issuing a factual report regarding · meteorological conditions at the time of the crash.

As a member of the group, Head interviewed various witnesses as to the weather at the time of the crash. Primarily, these witnesses were other pilots for USAir and CCAir (a shuttle service working under some contractual arrangement with USAir) who were at or near the airport around the time of the crash. Head used hand-written notes of his interviews and his memory to create a condensed type-written summary for the chairman of the meteorological group. It appears to be undisputed that after Head furnished his type-written summary, someone else further condensed and modified this summary for inclusion in the final meteorological group report. During his deposition, Head testified as follows:

> They are a condensement through another party of notes that I gave to [the chairman]. So each interview involved two to six or seven pages of hand-written notes that were condensed to one to three pages of type-written notes that were given to [the chairman] for his final approval and really modification to be put into this report.

Head thereafter discarded his original notes and, during their depositions, some of the people he interviewed have indicated that the final report incorrectly or inaccurately characterizes some of their statements. Most, if not all, of these people interviewed by Head have been deposed and have been questioned about their prior inconsistent statements during their deposition.

Plaintiffs apparently propose to use the final version of the interview notes of Christopher Head as contained on the final report as part of their case in chief. USAir has objected, contending that the Christopher Head notes, as contained in the report, are inadmissible hearsay and are also inadmissible because they are unreliable.

Taking the hearsay objection first, the court must disagree, at least in part, with the plaintiffs. As noted previously, many of the people interviewed by Head were USAir pilots on other planes. Therefore, their statements as initially given to Head are not hearsay under Evidence Rule 801(d)(2). The hearsay issue is more problematic with regard to the CCAir pilots, because from the record before it, the court cannot determine the exact relationship of CCAir to USAir. In light of the court's ultimate ruling on this issue, however, the court need not address this hearsay concern. To the extent the report itself may be considered hearsay, it is the court's determination that the factual parts of this report are potentially admissible under the hearsay exception provided in Evidence Rule 803(8) relating to public records and reports. *See* pages 1075–78 *infra.*

The suggestion by USAir that the report is itself unreliable gives the court more con-

cern. Rule 803(8) provides that public records may be inadmissible if "the sources of information or other circumstances indicate a lack of trustworthiness." On the record before it, the court cannot say with certainty that the Christopher Head notes, as contained in the final report, are completely trustworthy. Head himself has questioned the accuracy of the report, as have some of the people who were interviewed.[8]

Finally, it appears that Head was not trained in interviewing and recording statements from witnesses following a mass disaster, although this factor is of minimal significance to the court because it does not appear that substantial training or experience would be required to interview persons about weather conditions and accurately record their responses.

Although the court will grant the motion and not allow the Christopher Head report to be admitted as part of the plaintiffs' case in chief, the report itself may be used by the plaintiffs for impeachment on cross examination of the persons interviewed. That is to say, the plaintiffs may ask the interviewees about allegedly prior inconsistent statements given to Mr. Head. Depending upon their responses, the court may consider admitting the report at that time, for impeachment purposes only, with appropriate limiting instructions.

### 5. USAir's Motion To Exclude Certain FAA and USAir Documents and USAir's Motion to Exclude Evidence Regarding the Altitude Awareness Program

USAir seeks a ruling, *in limine*, that twelve documents should be excluded from any and all use at trial. Also, in a separate motion, USAir seeks to exclude from evidence any reference to USAir's "Altitude Awareness Program." The issues raised by these motions are related.

In its responsive memorandum, the PSC has indicated that with regard to the FAA and USAir documents that are subject to the motion *in limine*, they plan on offering only the following documents: (1) USAir's Special Inspection Report dated October 27, 1992, (2) USAir's Special Inspection dated May 16–27, 1994, (3) National Aviation Safety Inspection Program Inspection Report dated April 29, 1993, and (7) Internal White Glove dated 1991 into evidence. The PSC also advises that one of their expert witnesses may rely on these four documents plus exhibit 12, USAir Select Review Panel Operations and Training Booklet dated September 2, 1994. In other words, of the twelve USAir and FAA documents that are the subject of the motion *in limine*, the PSC presently intends to use only five of the documents. The PSC also indicates that it wishes to introduce the Altitude Awareness Program as part of its case in chief.

Unlike the other motions *in limine* discussed and decided above, the court determines, at this juncture, that it does not have enough information available to it to properly rule upon the motion *in limine*

At great risk of over–simplification, it can be said that the documents subject to this motion all relate generally to the concept of "standardization." Standardization is a concept by which pilots are expected to fly "by the book," following all applicable procedures and checklists. In some of the disputed documents, the PSC apparently wishes to show that USAir did not fly its planes "by the book" at all times. Because this court has not been exposed to the testimony, particularly the plaintiffs' expert witness, on the issue of standardization, it cannot rule upon the motion *in limine* at this time. The court will address the motion at such time as it has enough information assembled to make an informed decision on the merits.

To this end, the court would suggest that the parties consider producing the expert witness who will offer testimony on the concept of standardization for abbreviated testimony on Wednesday, January 15, 1997. It is possible that, given this testimony and any additional arguments that counsel wish to make, the court could rule upon the motion

---

**8.** Of course, it could be argued that Head himself created this problem by destroying his original notes and by not objecting when the final report, containing the "edited" version of his notes, was issued.

prior to the beginning of trial so that the court's ruling may be incorporated in the opening statements.

An alternative method of resolving the motion *in limine* regarding these disputed documents is to determine if they relate only to the question of corporate culpability, which arguably bears only on the issue of punitive damages. If so, the plaintiffs could be required to marshal their evidence at trial so that the standardization issues are presented in the second part of the liability portion of the trial. That is to say, an argument could be made that in order to recover at all, the plaintiffs must prove that at the time of the crash, the pilots did something or failed to do something which constituted negligence and which was a proximate cause of the crash. The plaintiffs could be required to produce this evidence in Part I of Phase I after which the jury would be instructed and asked to return a special interrogatory verdict on the question of negligence for the crash. If the jury found against USAir on this issue, then the plaintiffs could present whatever evidence the court determines is admissible in Part II of Phase I. This evidence would relate to the question of standardization and USAir's alleged failure to fly its planes "by the book" in terms of notice to USAir's management. Arguably, this evidence might relate only to the punitive damages question. After receiving this evidence in Part II, the jury would then again be instructed and asked to return a special interrogatory verdict on the punitive damages question.

Another way of handling the evidence would be to require the plaintiffs to marshal their evidence in the sequence described above, but wait and get special interrogatory verdicts at the end of all of the testimony.

The court is not wedded to the procedure outlined above but wishes to invite comments from counsel regarding the feasibility of such a procedure.

The court will conduct a telephone conference call with at least one representative from each party at 10:00 a.m. on Wednesday, January 8, 1997 for the purpose of discussing this issue. USAir, the moving party on this motion, shall initiate the conference call and shall patch the court in promptly at 10:00 a.m. after all other parties have been reached.

IT IS SO ORDERED.