FOURTH DIVISION

MARCH 6, 2003

1-01-2189) 

1-01-2781) Cons.

CRAIG ANDERSON, Special Administrator of the )

Estate of CATHERINE ANDERSON, )

Plaintiff, ) 

) Appeal from the 

v. ) Circuit Court of

) Cook County.

ALBERTO-CULVER USA, INC., AON CORPORATION, ) 

VILLAGE OF WHEELING, CITY OF PROSPECT HEIGHTS )

and PALWAUKEE MUNICIPAL AIRPORT COMMISSION, ) 

Defendants. ) 

________________________________________________)__________________________________

)

TERESA P. WHITENER, as Independent Administrator)

of the Estate of ROBERT HAMPTON WHITENER, )

Plaintiff-Appellee, )

)

)

)

AON CORPORATION and AON AVIATION, INC., )

Defendants/Third-Party )

Plaintiffs-Appellants, )

)

and ) 

)

THE ESTATE OF MARTIN L. KOPPIE, )

Defendant, )

)

v. )

)

ALBERTO-CULVER COMPANY and ALBERTO-CULVER USA, )

INC., )

Third-Party Defendants-Appellees. )

__________________________________________________)___________________________________ )

JACQUELINE L. QUERN, Independent Executor of )

the Estate of ARTHUR QUERN, )    

Plaintiff, )

)

)

)

ALBERTO-CULVER USA, INC., AON CORPORATION, )

VILLAGE OF WHEELING, CITY OF PROSPECT HEIGHTS, )

and PALWAUKEE MUNICIPAL AIRPORT COMMISSION, )

Defendants. )

__________________________________________________)___________________________________

)

KALYN ALWIN and DEVIN KOPPIE, Co-Administrators )

of the Estate of MARTIN LARRY KOPPIE, )

Plaintiffs, ) 

)

)

)

VILLAGE OF WHEELING, CITY OF PROSPECT HEIGHTS, )

PALWAUKEE MUNICIPAL AIRPORT COMMISSION, )

ALBERTO-CULVER USA, INC., ALBERTO-CULVER )

INTERNATIONAL, INC., ALBERTO-CULVER COMPANY, )

and TERESA P. WHITENER, as Independent )

Administrator of the Estate of ROBERT HAMPTON ) Honorable

WHITENER, ) Leonard R. Grazian

Defendants. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

A private airplane crash at Palwaukee Municipal Airport (Palwaukee) outside Chicago resulted in the deaths of all four people aboard, including Martin Larry Koppie (Koppie), senior pilot and captain for defendant, Aon Aviation, Inc. (Aon Aviation); Robert Hampton Whitener (Whitener), pilot for defendants, Alberto-Culver USA, Inc., Alberto-Culver Company (Alberto-Culver Co.) and Alberto-Culver International, Inc. (collectively, Alberto defendants), the registered owner of the airplane; Arthur Quern, Chief Executive Officer and Chairman of the Board for Aon Risk Management, Inc.; and Catherine Mio Anderson, a flight attendant employed by Executive Jet, whose services were secured by Aon Aviation.  Although each party brought multiple causes of action, 
inter
 
alia
, for wrongful death, survival, contribution and contractual indemnity, only the cases involving Whitener's and Koppie's Estates and the contribution claims between Alberto defendants and defendants, Aon Corporation (Aon Corp.) and Aon Aviation (collectively, Aon defendants), proceeded to a jury trial.  The contribution claims were separated from the underlying wrongful death and survival claims, and were to be tried consecutively to the same jury following their verdict.  The jury rendered a verdict in favor of Whitener's Estate and against Aon in the amount of $18,946,749; mistrials were declared as to all the remaining consolidated causes of action.

This case involved substantial technical facts and concepts, consumed 33 days for trial, at which 37 witnesses testified and over 915 exhibits were submitted, and required over 17,000 pages of record.  Accordingly, the discussion of facts, issues and disposition requires extensive consideration and has been bifurcated into this opinion and a Supreme Court Rule 23 (166 Ill. 2d R. 23 (Rule 23)) disposition, each being filed simultaneously with the other.

On January 24, 2001, the circuit court entered judgment on the jury verdict solely against Aon Corp.  On July 12, 2001, the court granted Alberto defendants' emergency motion to correct the record and entered judgment, 
nunc pro tunc
, January 24, 2001, against Aon Aviation, instead of Aon Corp.  

On appeal, Aon defendants seek reversal of both the January 24, 2001 and July 12, 2001 circuit court orders and remandment for a new trial, alleging error and lack of jurisdiction; error with respect to the procedure allowing the estates' cases to proceed to verdict prior to the presentation of evidence regarding the contribution claims; and error in certain evidentiary findings, which will be decided in this opinion.  The Rule 23 order will consider claims of error in certain other evidentiary findings, numerous alleged Supreme Court Rule 213 (177 Ill. 2d R. 213 (Rule 213 )) violations; error in the grant and refusal of certain jury instructions; error in denial of its motion to dismiss based upon Alberto defendants' failure to comply with a notice to produce; and error in the amount of the verdict.  All technical terms and explanations contained in the opinion or order emanate from evidentiary sources contained in the record on appeal.

Aon Aviation and Alberto-Culver Co. each maintained a flight department at Palwaukee and each operated their own Gulfstream IV (GIV) aircraft, a twin engine jet that requires a two-pilot crew.  On June 7, 1995, they entered into an Interchange Agreement, which permitted each to use the other corporation's GIV upon occasion.  Both parties agreed, 
inter
 
alia
, to (1) "hold harmless and indemnify the other from loss, expense, damages, claims or suits which they might suffer as a result of any act or omission of the other party"; (2) maintain operational control
(footnote: 1) of their own GIV during use by the other party; and (3) purchase an aircraft insurance policy with a minimum $150,000,000 coverage when piloting each other's airplanes.  Koppie, listed as chief pilot for Aon Aviation, signed the agreement twice for "Operational Control" and acceptance purposes.

On October 30, 1996, pursuant to the Interchange Agreement, an Alberto-Culver Co. GIV was scheduled to fly Aon's Quern from Wheeling, Illinois to Burbank, California.  Only one Alberto-Culver Co. pilot, Whitener, was available, and Aon Aviation was advised of the need to supply an Aon Aviation pilot to complete the flight crew.  Aon defendants chose to have a mixed flight crew that included one of their pilots and an Alberto-Culver Co. pilot.  Koppie volunteered to be the Aon Aviation pilot.  Whitener and Koppie had flown together in both the Alberto-Culver Co. and Aon Aviation GIVs on four prior occasions, during which each had acted as the "pilot in command" (PIC).
(footnote: 2)  Both had extensive flying experience in different types of aircraft, including the GIV.  Whitener logged 2000 and Koppie 500 hours of flight time in the GIV.  The two pilots also were familiar with Palwaukee.

Prior to departure, Whitener prepared and filed a flight plan at a computer terminal in the Alberto-Culver Co. office, showing the proposed route.  The plan listed Koppie as the PIC on the flight leg to Burbank and Whitener as the PIC on the return trip. 

Koppie sat in the left pilot seat and Whitener in the right pilot seat.  A cockpit voice recorder (CVR) recorded the pilots' completion of a pre-flight check of the aircraft, which included testing of the rudder, a vertical component of the tail that maintains side-to-side directional control.
(footnote: 3)
 The pre-flight check also revealed the position of nosewheel steering select switch (NSSS), which allows the pilot to turn off rudder pedal steering to the nosewheel of the aircraft and limit steering of the nosewheel to the tiller, also known as a handwheel.
(footnote: 4)  Gulfstream installed the NSSS on the Alberto-Culver Co. airplane during the summer of 1995 pursuant to Aircraft Service Change 302 (ASC 302).
(footnote: 5)  Each pilot determines by preference whether to leave the NSSS in a "handwheel only" position, meaning no rudder pedal input could be provided to the nosewheel.  Robert Fash, the Alberto-Culver Co. pilot who had flown the GIV to Palwaukee the night before the accident, left the NSSS in the handwheel only position. 

Neither Koppie nor Whitener reported any problems with the aircraft during the pre-flight check.  All flight controls were working normally when the aircraft taxied onto the runway for takeoff.
(footnote: 6)  When the flight was cleared for takeoff, strong and gusty crosswinds blew at 40 miles per hour from left to right across the departure runway.
(footnote: 7)  Nevertheless, the conditions were deemed safe for takeoff.  The airplane began to roll down the runway, but started to veer to the left side of the runway in the middle of its takeoff roll.  According to the National Transportation Safety Board (NTSB) report, the aircraft rolled onto the grass at the left side of the runway, traversing a shallow ditch that paralleled the runway, which resulted in the loss of the landing gear, flight control surfaces and other airplane components.  The airplane then slid on its belly and became airborne after it encountered a small berm at the departure end of the runway.  Once airborne, the airplane flew over Hintz Road, contacted an embankment along Wolf Road and skipped over Wolf Road, slid across a field and stream gully and came to rest on the edge of an apartment complex parking lot, where it was consumed by flames.
(footnote: 8)
 The crash site was secured by police and then by the NTSB and FAA, and the debris evidence was transported and stored in a hangar at Palwaukee.  The rudder actuator was identified in a photograph taken near the airplane's final resting place, but disappeared at some point during removal of the wreckage.  The Wheeling Fire Department conducted an extensive search for the missing rudder actuator for eight days after the accident.  Neither Alberto-Culver Co. nor Aon Aviation were involved in the search, nor were they responsible for securing and transporting the wreckage.  The NTSB and local authorities were the only agencies that had control over the rudder actuator and other aircraft components when the wreckage was transported to the hangar.

Each of the four estates of the persons who perished in the accident filed wrongful death actions, which were consolidated for discovery and trial and included various combinations of defendants.  Whitener's Estate alleged that Koppie was at fault for the accident and that Aon defendants failed to train and instruct adequately its pilots concerning procedures in mixed crew situations.  Koppie's Estate alleged that Whitener was at fault and also claimed negligence against Alberto defendants and the village of Wheeling, city of Prospect Heights and Palwaukee Municipal Airport (collectively, the Municipal defendants).  Alberto defendants and Whitener's Estate filed counterclaims and third-party claims for contribution and contractual indemnity under the Interchange Agreement against Aon defendants.  Aon Corp. initially filed a counterclaim against Alberto defendants for contribution and contractual indemnity pursuant to the Interchange Agreement, but later amended the counterclaim as Aon Aviation, not Aon Corp.

On May 24, 1999, the circuit court granted summary judgment in favor of Municipal defendants pursuant to the Illinois Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 
et
 
seq.
 (West 2000)).  The Estates of Koppie and Quern and Alberto defendants appealed that decision, which was reversed and remanded for trial on December 7, 2000.  See 
Anderson
, 317 Ill. App. 3d at 1117.  The supreme court denied Municipal defendants' petition for leave to appeal.  
Anderson v. Alberto-Culver USA, Inc.
, 194 Ill. 2d 565, 747 N.E.2d 351 (2001).

On November 6, 2000, the circuit court denied Alberto defendants' emergency motion to sever the case for trial.  

The consolidated causes of action proceeded to trial on November 14, 2000, but did not include claims asserted against Municipal defendants.  Whitener's Estate thereafter dismissed Koppie's Estate as a defendant.

On December 1, 2000, over Aon defendants' objection, the circuit court held that the contribution claims would not be tried until the conclusion of the wrongful death actions.  The court commented several times during trial regarding the jury's responsibility to decide the case in two phases, "first the two wrongful death cases and after that the contribution action," and that "the same jury is going to decide the whole thing."   

The Anderson and Quern Estates later entered into settlement agreements with Alberto defendants and their causes of action were dismissed.  Alberto defendants retained their contribution and third-party claims against Aon defendants for those settlements.

The following evidence was adduced at trial:

John Cork, Aon's director of flight operations, testified on behalf of Whitener's Estate.  The purpose of the October 30, 1996 trip was to bring Quern to a business meeting in California.  Cork was unsure if the pilot sitting in the left cockpit seat was the PF on October 30, 1996; Whitener "absolutely" was in operational control of the aircraft during takeoff.  Whitener was the PIC on the date of the accident as the representative for the company that owns the airplane, in this case, Alberto-Culver Co.

On cross-examination by Alberto defendants, Cork testified that Koppie was the PF and had responsibility for physically controlling the aircraft during the takeoff phase of the flight.  The cause of the crash was the failure of the PF to maintain directional control of the aircraft during a gusty crosswind.  Cork stated that there is a difference between operational control and physically operating the aircraft.

The circuit court, over objections from Aon defendants and Koppie's Estate, allowed the flight planning documents into evidence subject to cross-examination.
(footnote: 9)  Aon defendants' motion to redact the flight plan filing to remove the designation of Koppie as the PIC was denied, the court stating, "[t]his is computer-generated information and it was generated at a particular time on a particular date and that generated information is retained in Allied Signal, Honeywell, soon to be General Electric, files in Washington, D.C.  This comes directly out of that computer.  It carries with it the aura of genuineness and I'm going to take it without redaction."  The court noted other evidence showing that Koppie was the PIC.  

The circuit court also ruled that the NTSB factual report would be admitted into evidence based on Zamora's evidence deposition (see footnote 9).  The court noted that it reserved its ruling to determine whether there was proper foundation for the report because it states that Koppie was the PIC.  The court stated that it admonished the jury regarding what information would be admitted into evidence.  At trial, Zamora testified as she had previously outside the jury's presence.

Edward Mendenhall, chief of safety at Gulfstream Aerospace Corporation, testified for Whitener's Estate on direct examination that he was involved in the NTSB investigation.  He worked with Whitener at Gulfstream, and flew with him on several occasions between 1983 and 1985.  Whitener had excellent pilot skills and good cockpit resource management skills.  Aon defendants' objection to this evidence on grounds of remoteness was overruled.  In Mendenhall's opinion, the pilot in the left seat was operating the airplane.  Aon defendants' objections, based on speculation, were overruled on the ground that the opinion was based on the difference in conduct and the roles of the PF and PNF according to the CVR transcript from the accident.  

On cross-examination by Alberto defendants, Mendenhall testified that Koppie was both the PF and PIC.  Koppie failed to maintain directional control of the airplane.  The crosswinds contributed to the loss of control.  The accident would not have occurred if Koppie had stopped the aircraft when it started to veer from the center line of the runway during takeoff; the aircraft was "easily stoppable."  Whitener did not cause the crash because he was not operating the controls.  

Over Aon defendants' objections the circuit court allowed Mendenhall to testify regarding whether Gulfstream or the NTSB tested the nosewheel steering components following the accident.  Aon defendants objected to this testimony because the nosewheel steering system includes the rudder actuator, which was missing from the investigation.  Mendenhall clarified that the rudder actuator is interconnected to the nosewheel steering system through the rudder pedals, but is not actually part of the system.  

On cross-examination of Mendenhall by Aon defendants, counsel questioned whether the rudder actuator was part of the nosewheel steering system, and whether there was any malfunction of the aircraft, which the circuit court allowed because Aon defendants agreed to provide proof that a malfunction was the proximate cause of the accident.  Mendenhall testified that "[t]here was no determined malfunction on the airplane.  If there was a malfunction, the airplane still could have been stopped on the runway."  The court did not allow questioning regarding whether the accident was "called a directional control accident."  Aon defendants, however, did question Mendenhall regarding the NSSS and whether Koppie correctly used the rudder pedals to control the aircraft. 

David Kocher, a self-employed air safety investigator, testified on direct examination on behalf of the Whitener Estate that a flight plan is a document filed with "Flight Service," which requires a listing of the PIC on that flight.  

On cross-examination by the Koppie Estate, Kocher testified that it was more likely than not that Whitener prepared the flight plan filing.  The Air Route Traffic Control Center of Chicago received a flight plan filing for the October 30, 1996 flight from GDC.  Kocher stated that the PF has the responsibility of maintaining control of the aircraft on takeoff and, in this case, Koppie, the PF, also was the PIC.  Koppie was negligent because he failed to maintain directional control of the aircraft and, when he lost directional control, he failed to stop.  Based on his review of the NTSB factual report, Kocher stated the aircraft had no mechanical problems.

David Simmon, a retired United Airlines pilot, testified on direct examination for Koppie's Estate that Whitener was the PIC based on the fact that his employer, Alberto-Culver Co., owned the aircraft, and that the Interchange Agreement stated that each "airline" would maintain operational control of its airplanes.  Simmon had never piloted a GIV aircraft.  He explained that Whitener, as PIC, would decide where each pilot sat in the cockpit.  Alberto defendants had not taken proper steps to standardize procedures for a mixed flight crew.  Alberto defendants should have advised the pilots where the NSSS was located in their aircraft because the NSSS was situated in a different location from the Aon Aviation GIV.  Both pilots had flown the Alberto-Culver Co. GIV before and, therefore, both were aware of the NSSS location.  In this case, however, Whitener read and answered the checklist himself, which included a check of the NSSS position.

On cross-examination, Simmon testified that Koppie did not know the location of the NSSS, but agreed that every left seat pilot has a duty to know the location of that switch.  Simmon stated that Koppie turned the NSSS to the "on" position because the NTSB transcript of the flight recorded "two clunks," which represented noises turning on the hydraulics system.  There was no evidence that during the takeoff roll, Koppie changed the position of the NSSS.  Simmon referred to Koppie as the PF and to Whitener as the PNF.  Koppie had responsibility to maintain directional control of the aircraft.

During recross-examination of Simmon by Alberto defendants, he testified that, based on his review of the NTSB factual report, there was no evidence of a mechanical malfunction in the aircraft. 

Robert Hazlett, an FAA investigator, discussed operational control and the Interchange Agreement during direct examination by Whitener's Estate.  Hazlett explained that PIC and operational control commonly are misunderstood terms.  Operational control is a management function that has no role in the involvement of the accident.  Alberto-Culver Co. had operational control of the flight on October 30, 1996.  The PIC is responsible for the operation and safety of the aircraft during flight time.  Based on the flight plan, Hazlett believed that Koppie was the PIC.  In Hazlett's opinion, Koppie failed to maintain directional control of the aircraft and abort the takeoff. 

Hazlett testified on re-direct examination by Whitener's Estate that Whitener said "reverse" immediately after the aircraft veered off the runway.  

Donald Kennedy, an aerodynamics consultant, testified on direct examination on behalf of Koppie's Estate that directional control of the rudder was possible 14.1 seconds into the takeoff roll and from that point, a fully deflected rudder was capable of moving the aircraft toward the right.  In his opinion, a window of opportunity existed for five seconds thereafter, during which either pilot could have regained directional control of the aircraft by using the rudder pedals.  After reviewing the NTSB factual report, Kennedy testified that there was no mechanical malfunction of the aircraft.

During Aon defendants' cross-examination of Kennedy, the circuit court sustained an objection to their question concerning whether Kennedy reviewed discrepancy lists that referred in any way to the aircraft's directional control system.  The record shows that the discrepancy list aboard the aircraft was consumed by fire.

Michael Savarese, an Alberto-Culver Co. aircraft technician, testified
 that 
the aircraft's rudders moved normally during the pre-flight check and that the rudder actuator was missing during investigation of the crash. 

Fash, chief pilot for Alberto-Culver Co., testified that Koppie was the PIC, based upon the CVR recording team that listed him as captain, the flight plan filing and a National Business Aircraft Association letter to Cork.  The Alberto-Culver Co. flight manual specifies that the captain, the pilot sitting in the left seat, performs the takeoff.  Fash had no difficulty using the aircraft's rudder on his flight the night before the accident.  A lack of standardization of procedures between Aon Aviation and Alberto-Culver Co. was one of the causes of the crash.  

Calvin Tomomitsu and Richard DeVeze testified on direct examination for Alberto defendants that they were piloting an airplane that landed immediately prior to the takeoff of the Alberto-Culver Co. GIV.  Tomomitsu stated that the landing was smooth and normal, but he could feel the effect of wind gusts on his airplane.  Counsel for Whitener's Estate asked Tomomitsu on cross-examination if, on a windy day, hangars at Palwaukee have an effect on aircraft using the same runway involved in the accident.  Tomomitsu answered, over Aon defendants' objection, that the hangars have an effect on aircraft because they could shelter or disturb the winds.  Aon defendants moved to strike Tomomitsu's testimony, which the circuit court denied, stating expert testimony was unnecessary to show whether a building could block wind flow.   

DeVeze noted windy conditions at Palwaukee upon landing his airplane.  When landing at Palwaukee on the runway involved in the accident, he aims for the approach end of the runway because hangars located along the runway tend to block the wind, creating more turbulent conditions.  He was asked about a logbook entry for his October 30, 1996 flight, which was published to the jury.  Aon defendants objected to DeVeze's testimony because it was an undisclosed opinion in violation of Rule 213.  Counsel for Alberto defendants explained that he had received the logbook entry for the first time that morning.  The court questioned DeVeze regarding the logbook entry and then allowed him to testify because the parties could have investigated and interviewed the witness with respect to that information.  The logbook entry noted the windy conditions on the date of the accident and stated that the crash occurred at 12:59.  

George Clarke, an aircraft accident investigation consultant, testified on behalf of Alberto defendants regarding his reconstruction of the aircraft's flight path during the takeoff roll.  Aon defendants objected to the use of a demonstrative timeline showing the aircraft's path on the runway, arguing that the times and speeds were changed from the timeline presented at Clarke's deposition.  The circuit court ordered Alberto defendants to redact certain portions of the exhibit and stated that the parties could impeach Clarke regarding any differences in testimony during cross-examination.  Clarke testified that none of the speeds, times or distances on the timeline were changed from his previous version.  Koppie's Estate, but not Aon defendants, challenged the alleged changes to the timeline during cross-examination of Clarke.  

Clarke also testified that, in his opinion, Koppie's failure to maintain directional control of the aircraft caused the accident.  There was no indication of any malfunction of either the steering or rudder system.  An abort of the takeoff would not have kept the aircraft on the runway so Koppie took the appropriate action by attempting to takeoff.   

Prior to the questioning of Aon defendants' expert witness, Douglas Stimpson, the circuit court ruled that it would limit Stimpson's testimony regarding mechanical malfunction as a proximate cause of the accident, noting the experience and excellent record of the two pilots.  
The court precluded testimony concerning maintenance of the aircraft.

Stimpson, an aviation accident investigator and accident reconstructionist, testified that on October 30, 1996, the pilots were confronted with a malfunction that either made the airplane divert from the runway center line or prevented them from correcting the diversion.  The missing rudder actuator is a primary control during takeoff.  Stimpson believed that Koppie moved the NSSS from a normal position to the "handwheel only" position when the airplane would not respond to the right based upon evidence of tire scuff marks.  Koppie would have been aware of trouble-shooting with respect to the NSSS and at some point during the takeoff roll would "flip that switch."  There was no physical evidence of a rudder malfunction or failure of the NSSS.  
Stimpson was unable to establish a maintenance issue in this case.  

Jeff Beck, a GIV pilot and expert witness for Alberto defendants, testified on direct examination that Koppie was the captain flying the aircraft based on his seating on the left side of the cockpit, the flight plan filing, and the CVR.  The pilot flying in the left seat manipulates all the controls pertaining to the aircraft's steering components during the takeoff roll.  The CVR confirmed that the aircraft's rudder functioned normally and that the integrity of all the components that moved the rudder system worked properly.  To taxi toward the runway, Koppie had to use the tiller wheel to turn the nosewheel 90 degrees, which indicated the tiller wheel functioned properly.  

The circuit court denied Aon defendants the opportunity to cross-examine Beck regarding Stimpson's opinion on the issue of aircraft malfunction because it was improper for one expert to comment on another expert's testimony
.  
The court explained to Aon defendants that they could cross-examine Beck regarding a mechanical malfunction of the aircraft.  Beck testified there was no malfunction.

The circuit court also precluded Aon defendants from cross-examining Beck regarding ASC 302.  Counsel for Aon defendants provided their offer of proof by reading from the subject aircraft's maintenance records regarding ASC 302, which state, "[s]ervice experience has
 
revealed occasions when failure of the rudder pedal
 
sensors have caused flight delays or cancellations.  This installation [of the NSSS] will allow the aircraft to operate in hand wheel only until repairs can be made."  Aon defendants argued that ASC 302 maintenance records provide evidence that Koppie, in an effort to steer the aircraft, switched the position of the NSSS.  The court clarified the reasoning for barring cross-examination on this subject, stating, "if your [rudder pedal] sensors aren't working, rather than have a delay in repairing the sensor, all you need do is go to a hand-wheel-only operation.  That's all it means, and I'm barring you from going
 
into that."  The court noted that Aon defendants' conclusion that Koppie switched the position of the NSSS could not be drawn from the maintenance records.  

Dr. Edmund R. Donoghue, a forensic pathologist, testified that Whitener's ankles and feet were not injured, which indicated his feet were not on the rudder pedals at the time of the accident.  Conversely, Koppie had rudder pedal injuries and wrist injuries that demonstrated he was flying the aircraft.

On January 4, 2001, Aon defendants moved for a partial directed verdict against Whitener's Estate regarding Aon defendants' alleged independent corporate negligence, which the circuit court granted.  The Estate of Whitener's case against Aon defendants went to the jury solely for its alleged vicarious liability for the negligent acts of its pilot, Koppie.
(footnote: 10)  

During the jury instructions conference, the parties agreed upon liability and burden of proof instructions that made references to "Aon" without differentiating between Aon Corp. and Aon Aviation.  The parties discussed Alberto defendants' instruction number 2 which, in its initial draft, referred to the rights of Alberto defendants and Aon Aviation.  Counsel for Aon defendants instructed that it should be changed to "Aon."    

In addition, when agency instructions were discussed, the circuit court stated, "[l]eave off Aon Aviation, Inc.  Just call them Aon."  Aon defendants' attorney replied, "[j]ust Aon.  I understand.  We are not contesting the agency ***."  Aon defendants did not object based on the particular name assigned to them on the issue of agency.

Aon defendants also tendered and the circuit court allowed Illinois Pattern Jury Instruction (IPI) 12.05, a sole proximate cause instruction, which listed Aon defendants as "Aon."
(footnote: 11)  Aon defendants objected to a tendered contribution instruction from Alberto defendants that referred to Aon Aviation.  Illinois Pattern Jury Instructions, Civil, No. 600.09 (2000).  The court noted that the parties had been using the names Aon Corp. and Aon Aviation interchangeably throughout the trial and that Aon defendants' name was shortened to "Aon" for the jury.  The court stated, "I think we have been using Aon in this situation.  The verdicts will be corrected in the form of the judgment when [the parties] decide what are the right names of the parties because you have Aon.  ***  We're calling it Alberto-Culver and we're calling it Aon, okay?"  The court directed Alberto defendants to list Aon defendants as "Aon also known as Aon Aviation, Inc." on the contribution instruction.  Aon defendants did not object to use of the name "Aon" on the jury verdict forms.   

On January 23, 2001, the jury returned a verdict in favor of the Whitener Estate and against "Aon" in the amount of $21,051,943, which was reduced by 10% for Whitener's contributory negligence to $18,946,749.  The circuit court entered judgment on the verdict on January 24, 2001.  The order stated that the jury rendered a verdict against "Aon Corporation" and declared a mistrial as to any and all remaining causes of action, including the Koppie Estate's claim and all claims for contribution "by and between Alberto-Culver USA Inc. and Aon Aviation Corp." and contractual indemnity in the Interchange Agreement "by Aon Corporation aka [
sic
] Aon Aviation Corp. against Alberto-Culver USA, Inc."  With respect to the declaration of mistrials, the order was corrected to remove Aon Corp. from the cross-action for contribution and include Aon Aviation for the contribution and contractual indemnity actions.  Counsel for Aon defendants told the court that it could not "enter a judgment on this verdict given the fact that we did not have an opportunity in the contribution case that was joined to litigate that.  Remember we had the issues in the contribution case.  You can take the verdict," but "[y]ou can't enter judgment."

Aon defendants filed a post-trial motion on February 16, 2001, which included a contention that the circuit court erred by entering judgment against Aon Corp.  On February 22, 2001, Alberto defendants filed a post-trial motion to vacate the orders directing mistrials in the third-party contribution actions, to enter judgment against Aon on Alberto-Culver's third-party complaints for contribution and to enter a directed verdict against Koppie in favor of Alberto-Culver.  Alberto defendants' post-trial motion did not address the issue of the January 24, 2001 judgment against Aon Corp.  

Alberto defendants and Whitener's Estate opposed Aon defendants' assignment of error regarding the entry of judgment against Aon Corp. in their separate responses to the post-trial motion.  

On May 11, 2001, the circuit court denied both Alberto and Aon defendants' post-trial motions and specifically found "no just reason to delay the enforcement or appeal of this order pursuant to [Supreme Court] Rule 304(a)."    

On June 8, 2001, Aon defendants filed their notice of appeal from the order entered on January 24, 2001 entering judgment in favor of the Whitener Estate and against "Aon" in the amount of the jury verdict.  Alberto defendants did not appeal or cross-appeal.

Alberto defendants filed an emergency motion to correct the record on July 11, 2001, arguing that the January 24, 2001 order entering judgment against Aon Corp. was a clerical error.  Alberto defendants sought to correct the order, 
nunc pro tunc
, to substitute Aon Aviation as judgment debtor.  Aon defendants responded to the motion, asserting that because they had filed a notice of appeal, the circuit court no longer had jurisdiction to correct the order, 
nunc pro tunc,
 and contending that the issue of naming the correct judgment debtor is substantive, not clerical.

On July 12, 2001, the circuit court heard argument on Alberto defendants' emergency motion.  On the same date, the court entered an order 
nunc pro tunc
 entering judgment on the jury verdict in favor of Whitener's Estate and against Aon Aviation.  The order declared mistrials in all remaining causes of action, found that naming Aon Corp. as the party against whom judgment was entered on January 24, 2001 was a clerical error and that the January 24 order was void and of no effect.  Another July 12, 2001 order dismissed Aon Corp. with prejudice and without costs, 
nunc pro tunc
, as of November 28, 2000, the date the court granted Aon defendants' motion to dismiss Aon Corp. as a party.  Aon defendants appeal.

I

A. Aon defendants initially contend that the circuit court erred by entering its judgment on the jury verdict against Aon Corp. on January 24, 2001 because the court previously had granted Aon Corp.’s motion to dismiss on November 28, 2000. 

The Whitener Estate responds that Aon defendants waive this argument because it did not seek such relief in its initial notice of appeal, which sought a reversal of the January 24, 2001 order and a remand to the circuit court for further proceedings, including a new trial.

In 
Peluso v. Singer General Precision, Inc.
, 47 Ill. App. 3d 842, 851, 365 N.E.2d 390 (1977) (
Peluso
), the court held that, although defendants’ notice of appeal included a request of relief separate from the relief requested in their original appellate brief, plaintiffs were not prejudiced by defendants’ notice of appeal.  The court rejected plaintiff’s contention that the appeal be dismissed.  
Peluso
, 47 Ill. App. 3d at 851.  We do likewise here.  No record evidence shows prejudice against either Whitener’s Estate or Alberto defendants as a result of Aon defendants’ first notice of appeal.  

Aon defendants agreed that the two Aon companies would be treated as one entity.  The circuit court and Aon defendants’ attorney referred to the two Aon entities as one party throughout the trial without objection.  Aon defendants waived and are estopped from any attempt to draw a distinction between their two corporate identities in order to create a procedural advantage.

B.  Aon defendants next argue that the circuit court had no jurisdiction to enter any orders on July 12, 2001 because the issue of naming the correct judgment debtor is substantive rather than clerical, and that Alberto defendants have no standing to raise this issue because they were not a party in the judgment.

With respect to Alberto defendants’ standing as a party, the purpose of the standing requirement is to preclude a person having no interest in a controversy from bringing suit.  
Brockett v. Davis
, 325 Ill. App. 3d 727, 730, 762 N.E.2d 513 (2001) (
Brockett
).  To have standing, the putative party must suffer some injury in fact to a legally cognizable interest and must have sustained, or be in immediate danger of sustaining, a direct injury as a result of the complained-of conduct.  
Brockett
, 325 Ill. App. 3d at 730.  Here, Alberto defendants filed both a contribution claim and third-party claim against Aon defendants and, therefore, had a legally cognizable interest in the outcome of the trial although they were not part of the judgment.  Alberto defendants have standing.

Generally, upon the proper filing of a notice of appeal, "the appellate court’s jurisdiction attaches 
instanter
, and the cause is beyond the jurisdiction of the [circuit] court."  
Daley v. Laurie
, 106 Ill. 2d 33, 37, 476 N.E.2d 419 (1985).  A filing of a notice of appeal deprives the circuit court of jurisdiction to modify its judgment or to rule on matters of substance which are the subjects of appeal.  
Bachewicz v. American National Bank and Trust Co. of Chicago
, 135 Ill. App. 3d 294, 297, 482 N.E.2d 95 (1985).

A 
nunc pro tunc
 order is "any entry in the present for something previously done, made to make the record speak now what was actually done then."  
Johnson v. First National Bank of Park Ridge U/T #205
, 123 Ill. App. 3d 823, 827, 463 N.E.2d 859 (1984) (
Johnson
).  The circuit court has inherent power to enter an order, 
nunc pro tunc, 
at any time to correct a clerical error or matter of form so that the record reflects the actual order or judgment rendered by the court when such entry is based upon a definite and certain record.  
Johnson
, 123 Ill. App. 3d at 827.  Judgments may be modified 
nunc pro tunc
 only when the correcting order is based upon evidence such as a note, memorandum or memorial paper remaining in the files or upon the records of the court.  
Beck v. Stepp
, 144 Ill. 2d 232, 238, 579 N.E.2d 824 (1991) (
Beck
).  The evidence supporting 
nunc pro tunc
 modification must demonstrate clearly that the order being modified fails to conform to the decree actually rendered by the court.  
Beck
, 144 Ill. 2d at 238.

Clerical errors in orders, including the name of the correct judgment debtor, can be modified in an order, 
nunc pro tunc
.  
Johnson
, 123 Ill. App. 3d at 827-28; 
Southland Corp. v. Village of Hoffman Estates
, 130 Ill. App. 2d 311, 314-18, 264 N.E.2d 451 (1970) (
Southland
).  Here, the July 12, 2001 
nunc pro tunc
 order was not a change of substance that would present a 'new case' to this court from the matter that was appealed.  The Whitener Estate filed its complaint against both Aon corporate entities.  Although the circuit court and parties to the case frequently referred to Aon defendants as "Aon" throughout the trial and did not distinguish Aon Aviation from Aon Corp., the court already had dismissed Aon Corp. as a party prior to opening argument.  The record shows the basis upon which the amendment was made.  
Southland
, 130 Ill. App. 2d at 317-18.  Therefore, upon modifying the January 24, 2001 order, the court was not deciding a substantive issue because Aon Corp. was no longer a party.  Liability was rendered upon Aon Aviation as the only remaining Aon corporate entity.  The court here merely corrected a clerical error to reflect the proper name of the judgment debtor.  
Johnson
, 123 Ill. App. 3d at 828.

Aon defendants also assert, in their reply brief, that Alberto defendants moved to correct the record six days after the circuit court entered an order finding that Alberto defendants had a duty to indemnify Aon Corp. for the judgment entered in favor of the Whitener Estate.
  Because Alberto defendants failed to raise this argument in its first post-trial motion and moved to correct the record after Aon defendants filed their initial notice of appeal, Aon defendants argue that the court was divested of any jurisdiction in this matter.  Aon defendants provide no legal authority or record evidence to support this argument in contravention of Supreme Court Rule 341(e) (188 Ill. 2d R. 341(e)).  Bare contentions without argument or citation to legal authority do not merit consideration on appeal.  188 Ill. 2d R. 341(e); 
Fuller v. Justice
, 117 Ill. App. 3d 933, 942-43, 453 N.E.2d 1133 (1983)
.  

Aon defendants’ argument is deemed waived.  See 
Nancy’s Home of the Stuffed Pizza, Inc. v. Cirrincione
, 144 Ill. App. 3d 934, 939, 494 N.E.2d 795 (1986)
.

C.  Aon defendants next argue that the circuit court erred in accepting the Whitener Estate’s jury instruction number 28 under IPI 50.02 (Illinois Pattern Jury Instruction, Civil, No. 50.02 (2000)) and rejecting Aon defendants’ tendered jury instruction number 11 because there is no record evidence that Koppie was the employee of either Aon Corp. or Aon Aviation.  Witness testimony and the Interchange Agreement, signed by Koppie as chief pilot for Aon Aviation, show that Koppie was an employee and agent for Aon Aviation.  Aon defendants’ argument is rejected.

D.  Aon defendants next assert that the circuit court was biased and denied them a fair trial because of inconsistent rulings.  Again, Aon defendants cite neither the record nor legal authority to support their claim.  A circuit judge is presumed to be impartial and the burden of overcoming this presumption rests with the party asserting bias.  
In re Trusts of Strange
, 324 Ill. App. 3d 37, 43, 755 N.E.2d 149 (2001).  Actual prejudice in the form of personal bias stemming from an extrajudicial source and prejudicial trial conduct must be shown.  
Hartnett v. Stack
, 241 Ill. App. 3d 157, 169, 607 N.E.2d 703 (1993).  The entry of an adverse judgment, standing alone, is not evidence of judicial bias.  
People v. Hall
, 157 Ill. 2d 324, 335, 626 N.E.2d 131 (1993).

Aon defendants present no proof of actual prejudice in the record other than asserting cumulatively that the circuit court was biased.  Aon defendants did not overcome the presumption that the court was impartial.  No bias was shown.

II

Aon defendants next contend that the circuit court erred by phasing the trial and allowing the estates' cases to proceed to verdict prior to the conclusion of evidence, argument, jury instructions and deliberations on the remaining causes of action and, as a result, the court erred by entering judgment on the verdict in favor of Whitener's Estate and declaring mistrials as to all remaining causes of action.  Aon defendants maintain that all the causes of action raised in this case arise out of the same occurrence, the airplane crash on October 30, 1996.  Because the court entered judgment on only one of the causes of action, Aon defendants argue that the remaining mistried cases will result in inconsistent verdicts when retried.

The record shows that the circuit court sent the estates' tort claims to the jury first with the intention of having that jury subsequently decide the contribution actions.  The court merely ordered the presentation of evidence and argument into stages so the jury could appreciate and concentrate on different issues.  Aon defendants fail to cite any legal authority that bars the court from ordering the proceedings in that fashion.  By phasing the trial, the court properly excluded evidence of settlement agreements by the Anderson and Quern Estates that were irrelevant to the claims of the Whitener and Koppie Estates and highly prejudicial to Alberto defendants.  In addition, the court's procedure specifically is recognized by the IPI.

The IPI illustrates five scenarios in which contribution claims may be tried, including where "[o]ne or more defendants bring a claim for contribution against a third party defendant (
not
 sued by the plaintiff in the prime action); defendant(s) may or may not counterclaim for contribution; contribution claim(s) submitted to the same jury 
after
 it has returned a verdict against one or more defendants in the prime action (referred to herein as submitted 'consecutively'), as specifically provided in IPI 600.03."  (Emphasis in original.)  Illinois Pattern Jury Instructions, Civil, Nos. 600.00, special note on use, at 648, 600.03 (2000).

Nevertheless, Aon defendants argue that the supreme court's ruling in 
Laue v. Leifheit
, 105 Ill. 2d 191, 473 N.E.2d 939 (1984) (
Laue
) prevents multiple juries from deciding separate issues of liability to plaintiff and the percentages of liability among defendants, thereby avoiding a multiplicity of lawsuits and the possibility of inconsistent verdicts.  Aon defendants misstate the holding in 
Laue
.  There, the court found that where a personal injury action involving joint tortfeasors is pending, the contribution claim should be 
asserted
 by counterclaim or third-party claim in that action or otherwise the contribution claim is barred.  (Emphasis added.)  
Laue
, 105 Ill. 2d at 195-97.  Contrary to Aon defendants' argument, the 
Laue
 court suggested,  but did not require, one jury to hear underlying tort claims and contribution claims together as a matter of judicial economy.  See 
Cook v. General Electric Co.
, 146 Ill. 2d 548, 556, 588 N.E.2d 1087 (1992) (
Cook
).

The circuit court, in the exercise of broad discretion, is allowed wide latitude when conducting a trial.  
Gowler v. Ferrell-Ross Co.
, 206 Ill. App. 3d 194, 213, 563 N.E.2d 773 (1990); 
Mathieu v. Venture Stores, Inc.
, 144 Ill. App. 3d 783, 801, 494 N.E.2d 806 (1986).  "When a lawsuit is tried on combined claims of comparative negligence and contribution ***, the jury must be instructed separately and return separate verdicts on the claims."  
Ogg v. Coast Catamaran Corp.
, 141 Ill. App. 3d 383, 385-86, 490 N.E.2d 111 (1986). 

Here, both Aon and Alberto defendants asserted their counterclaims and third-party claims as required by 
Laue
 and the circuit court, under consideration of judicial economy, made clear throughout the trial that the same jury would hear the underlying tort claims and contribution claims.  The jury heard evidence in the estates' cases, which included evidence of alleged negligence committed by both Aon and Alberto defendants.  The court did not sever the trial or set a separate proceeding to decide the contribution and third-party claims until after the jury reached its verdict.  No written order was entered severing the trial.  Section 2-614(b) (735 ILCS 5/2-614(b) (West 2000)) of the Code of Civil Procedure provides that the circuit court "may, in its discretion, order separate trial of any causes of action, counterclaim or third-party claim if it cannot be conveniently disposed of with the other issues in the case."  Following 
Cook
, the same jury need not decide the estates' claims with the contribution and contractual indemnity claims.  146 Ill. 2d at 556.  Aon defendants have not shown that the court abused its discretion by allowing the estates' cases to proceed to verdict prior to the contribution and contractual indemnity claims or that the court abused its discretion by entering judgment on the verdict in favor of Whitener's Estate and declaring mistrials as to all remaining causes of action.

Aon defendants also argue that the issue of collateral estoppel extrinsically is linked to both Alberto defendants' contribution claims for its settlements of the Quern and Anderson Estates and Aon defendants' tendered jury instructions under IPI 1.03 and 600.09 (Illinois Pattern Jury Instructions, Civil, Nos. 1.03, 600.09 (2000)), which, according to Aon defendants, were refused by the circuit court.  Aon defendants assert that because the jury found that Koppie was 90% at fault and Whitener was 10% at fault solely in the Whitener Estate's case, future retrials on the remaining claims must be compared with other possible causes for the accident.

Collateral estoppel is an equitable doctrine that precludes a party from relitigating an issue decided in a prior proceeding.  
Herzog v. Lexington Township
, 167 Ill. 2d 288, 294, 657 N.E.2d 926 (1995).  This court cannot address Aon defendants' collateral estoppel argument at this juncture because none of the reversed or mistried cases set for retrial have commenced and, therefore, which issues will be relitigated cannot be foreseen.  

III

Aon defendants next maintain they were prejudiced irreparably by the circuit court's prohibition against introducing maintenance issues, resulting in Aon defendants' failure to establish that a mechanical malfunction in the aircraft was the sole proximate cause of the accident.  Specifically, Aon defendants argue that the court improperly precluded Stimpson from testifying regarding prior maintenance and malfunction incidents and that negligent maintenance was a possible cause of the accident. 

In their trial brief, addressing malfunction issues, Aon defendants stated that "AON is not claiming that the Gulfstream aircraft was defective, or that Alberto-Culver negligently maintained the aircraft."  Aon defendants failed to disclose any witnesses who could establish that a failure of the rudder pedal sensors and directional control system of the aircraft proximately caused the accident. 

Despite the circuit court's preclusion of testimony concerning maintenance of the aircraft, it nevertheless allowed Stimpson to testify about whether the aircraft malfunctioned.  He stated that the accident was the consequence of some mechanical malfunction and that the nosewheel steering system was the source of the malfunction.  Stimpson also testified that there was no evidence of a rudder malfunction or NSSS failure, which demonstrates that no factual bases linked a mechanical malfunction to the changes instituted by ASC 302, contrary to Aon defendants' argument.  Stimpson, Aon defendants' expert witness, testified that he was unable to establish a maintenance issue.  Moreover, the record shows numerous opinions, including those of Aon defendants' witnesses, that the aircraft did not malfunction on October 30, 1996.
(footnote: 12)  Further, the record shows that regardless of a malfunction, the aircraft could have been stopped to avoid the accident.

No abuse of discretion has been shown.  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 92, 658 N.E.2d 450 (1995).

IV

Aon defendants next assert that the circuit court erred by allowing introduction of the NTSB factual report, which identified Koppie as the PIC.  Aon defendants challenge Zamora's testimony as a foundational basis for admitting the report, arguing that Zamora did not testify that the equipment used to store information of the flight planning documents, which the NTSB used as its only basis to identify Koppie as PIC, was recognized as standard.

Illinois courts have recognized a distinction between computer-generated and computer-stored records.  Records directly generated by a computer generally are admissible as representing the tangible result of the computer's internal operations.  
In re Marriage of DeLarco
, 313 Ill. App. 3d 107, 114, 728 N.E.2d 1278 (2000) (
DeLarco
).  In contrast, printouts of computer-stored records constitute statements placed into the computer by out-of-court declarants and cannot be tested by cross-examination and, therefore, are inadmissible absent an exception to the hearsay rule.  
DeLarco
, 313 Ill. App. 3d at 114. 

Here, Zamora testified that GDC used a highly technical and reliable form of Apollo computer considered standard for use of computing flight plan information.  Information for the flight planning documents was received by GDC at least one hour prior to flight time on October 30, 1996.  Zamora's testimony establishes that the sources of information, method and time of preparation indicate trustworthiness and justify admission of the flight planning documents. 

The record evidence shows that flight plan filings, such as the one filed in the instant case, are generated in the regular course of business and transmitted to the FAA or, otherwise, the subject flight would not have been cleared for takeoff.  Zamora described the entire process for submitting, storing and retrieving the flight planning documents.  There is nothing inherently untrustworthy about the procedures testified to by Zamora.  Zamora's testimony that she had no personal knowledge of the entrant or maker of the documents may affect the weight of her testimony, but not its admissibility.  See 145 Ill. 2d R. 236(a).   

The circuit court properly admitted the flight planning documents within the business records exception to the hearsay rule and did not abuse its discretion by admitting the NTSB factual report based on the information contained in the flight planning documents.

Aon defendants, citing 
Van Steemburg v. General Aviation, Inc.
, 243 Ill. App. 3d 299, 611 N.E.2d 1144 (1993) (
Van Steemburg
), argue that the circuit court erred by admitting into evidence and publishing to the jury the opinions in the NTSB factual report.  They contend the information contained in the report regarding Koppie’s status as PIC was an interpretation of information gathered from secondary sources by NTSB investigators.  In 
Van Steemburg
, over plaintiffs' objection and contrary to a prior ruling on plaintiffs' motion 
in
 
limine
, the circuit court allowed defendants to cross-examine plaintiffs' experts with specific references to two "opinions" contained in an NTSB accident report.  The findings in 
Van Steemburg
 are inapplicable to the instant case because Aon defendants are contesting the admission of the NTSB factual report itself, which did not occur in the above-discussed case.

The Whitener Estate argues that the NTSB factual report is admissible, citing 
In re Air Crash at Charlotte, North Carolina on July 2, 1994
, 982 F. Supp. 1071 (D. S.C. 1996) (
In re Air Crash at Charlotte
) and 
Keen v. Detroit Diesel Allison
, 569 F.2d 547 (10th Cir. 1978) (
Keen
).  Both 
In re Air Crash at Charlotte
 and 
Keen
, however, do not involve the admission of NTSB reports, but refer to federal statutory language, which provides, "[n]o part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting in a matter mentioned in the report."  982 F. Supp. at 1075; 569 F.2d at 549.  The court in 
In re Air Crash at Charlotte
 notes that since 1951, courts routinely have admitted the factual portions of investigative reports generated after an airline disaster.  The majority of courts allow the admission of factual reports as long as they do not contain agency conclusions on the probable cause of accidents.  
In re Air Crash at Charlotte
, 982 F. Supp. at 1077.

Assuming, 
arguendo
, that admission of the NTSB report was error, it was harmless in light of the fact that testimony throughout the trial clearly demonstrated that Koppie was the PF, the pilot manipulating the controls during the takeoff roll.

Based on the foregoing analysis and discourse, the trial was conducted fairly and properly, the jury verdict was based upon evidence submitted by the parties, the jury's award was supported by the record and was not palpably erroneous or unwarranted, and there is no basis for disturbing the result reached.  
Parker v. Illinois Masonic Warren Barr Pavilion
, 299 Ill. App. 3d 495, 499, 701 N.E.2d 190 (1998).  

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.

FOOTNOTES
1:
The Interchange Agreement does not define "operational control," but refers to the Department of Transportation under the Federal Aviation Administration (FAA) for an explanation of this term.  Operational control is defined in Title 14, Part 1, Section 1 of the Code of Federal Regulations as "the exercise of authority over initiating, conducting or terminating a flight."  14 C.F.R. §1.1 (2001).

2:
The PIC is defined as "the person who: (1) [h]as final authority and responsibility for the operation and safety of the flight; (2) [h]as been designated as pilot in command before or during the flight; and (3) [h]olds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight."  14 C.F.R. §1.1 (2001).  

3:
The rudder is controlled by floor pedals in front of each pilot.  If the aircraft veers to the left during takeoff, the pilot steps on the right rudder pedal to bring the aircraft back toward the center line of the runway.  Rudder pedal input is transferred to the rudder through the aircraft's hydraulic lines.  A rudder actuator uses hydraulic pressure to provide additional force to move the rudder when the aircraft is in flight.

4:
It should be noted that steering the nosewheel through the rudder pedals is limited to seven degrees of movement in comparison to the tiller, which allows the nosewheel to rotate up to 90 degrees.  

The tiller is used similarly to a steering wheel in an automobile and is the primary method of steering the aircraft on the ground.  In initial models of GIV aircraft, the rudder pedals always were connected to the nosewheel.  Gulfstream then made available the NSSS so the pilot could elect to disconnect the nosewheel control from rudder pedal control.  

5:
Aon Aviation also installed the NSSS on its GIV at the request of Koppie.  

6:
During the takeoff roll, the pilot flying (PF) keeps his feet on the rudder pedals while the pilot not flying (PNF) keeps his feet on the floor.  The PF, a term separate from the PIC, manipulates the aircraft's controls from either the left or right cockpit seat and is responsible for the takeoff roll.  The PNF monitors the flight instruments, calls out airspeeds, sets the flaps and communicates on the radio.  Generally, the PIC sits in the left seat unless the flight is instructional.  The PF is not always the PIC.  The pilot sitting in the left seat normally performs the takeoff roll.  The pilot in the right seat does not have access to the tiller wheel during taxiing and takeoff.

7:
Crosswinds cause aircraft to turn into the wind, similar to a weathervane, during the takeoff roll.  The left seat pilot gradually "feed[s] the rudder" while traveling down the runway to counteract the crosswinds and keep alignment with the tiller.  In addition, the left seat pilot uses the tiller to maintain control of the aircraft's position along the center line of the runway.

8:
The potential involvement of the airport construction and maintenance as  causes of this accident is explicated in 
Anderson v. Alberto-Culver USA, Inc.
, 317 Ill. App. 3d 1104, 740 N.E.2d 819 (2000) (
Anderson
).

9:
Outside the presence of the jury, Alberto defendants presented the evidence deposition of Karen Zamora, a representative of Honeywell, Inc., formerly Allied Signal, Inc., for the purpose of laying a foundation for two documents, the flight plan and flight plan filing.  Zamora worked in a department entitled, Global Data Center (GDC), also known as Flight Data Services, which provides preflight planning and weather services composed of computerized data in textual form.  She was familiar with flight plans and filing processes.  She identified the printout of two flight plans filed through GDC computers and the actual computed flight plan as GDC business records, which GDC generated in the course of their business.  The information for the documents was received by GDC at least one hour prior to flight time on October 30, 1996.  GDC stores the information on magnetic tape for three to nine months.  The magnetic tape is identified by date when a backup version is created and sent to an off-site storage facility and is not reused again during the three to nine month storage period.  The information pertinent to this case was retrieved on April 3, 1997.  GDC used a highly technical and reliable form of Apollo computer considered standard within Honeywell for use of computing flight plan information.  Flight plan documents are prepared by a GDC employee who routinely handles that type of information.  The information contained in the October 30, 1996 flight plan documents was kept in the course of regularly conducted GDC business activity and was an accurate representation of the data stored by GDC.

On cross-examination, Zamora testified that she did not know on what date the hard copy version of the flight planning documents was printed, but stated the documents were printed in connection with the accident investigation.  She explained that hard copy versions are not kept in the ordinary course of business.  No GDC policy was developed concerning the preservation of flight planning documents following accidents.  Zamora stated that the flight plan for October 30, 1996 had to be recomputed and generated on November 3, 1996.  She could not testify to the accuracy of the information computed to generate the flight planning documents.

10:
The circuit court stated that the partial directed verdict motion was granted only on the allegations of independent corporate negligence of Aon defendants, including but not limited to its failure to: (1) train and instruct adequately its pilots concerning procedures in mixed crew situations; (2) incorporate Gulfstream supplement No. GIV-94-01 into its checklist; and (3) institute an adequate flight operations manual detailing mixed crew procedures.

11:
Aon defendants' sole proximate cause jury instruction stated,

"If you decide that the Defendant Aon was negligent and that their negligence was a proximate cause of injury to the Plaintiff Robert Hampton Whitener, it is not a defense that something else may also have been a cause of the injury.  However, if you decide that the sole proximate cause of injury to the Plaintiff Robert Hampton Whitener was something other than the conduct of the Defendant Aon, then your verdict should be for the Defendant Aon."

12:
The following witnesses testified that no aircraft malfunction occurred on October 30, 1996:

John Cork, director of flight operations for Aon Aviation, Inc.; Edward Mendenhall, chief of safety for Gulfstream Aerospace Corporation; David Kocher, a self-employed air safety investigator; David Simmon, expert for Koppie's Estate; Donald Kennedy, an aerodynamics consultant; Jeff Beck, expert for Alberto-Culver; George Clarke, aircraft accident investigation consultant; and 

William Perry, a GIV pilot.